CRT, Inc. *v.* Evelyn DUNN and Lamar Dunn

5-5200                                                      451 S. W. 2d 215

Opinion delivered March 9, 1970

*Shackleford & Shackleford,* for appellant.

*Brown, Compton, Prewett & Dickens,* for appellees.

LYLE BROWN, Justice. Appellant Evelyn Dunn was injured when she lost control of her car as a result, so she claimed, of fuel oil being spilled on the highway from a tanker truck belonging to appellant, CRT, Inc. Evelyn Dunn was awarded damages for personal injuries and her husband, Lamar Dunn, obtained a judgment for his wife's medical expenses and for his loss of consortium. On appeal CRT attacks the sufficiency of the evidence on liability and challenges the propriety of one instruction.

CRT's driver, Morris W. Craig, picked up a load of fuel oil at Lion Oil Refinery, El Dorado, around 9:00 p.m. on the night of March 27, 1968. He left the refinery with a load of 5,300 gallons. His destination was Russellville. As Craig drove out the refinery gate he noticed a parked white automobile. That vehicle fell in behind Craig and followed, pulled up beside the tanker and then overtook Craig. The driver of the white vehicle signaled with his lights for Craig to stop but he declined to do so because of the unusual antics of the car. Craig tried to pass the car but the driver of the latter would block him. When the two vehicles passed Wheeling Pipeline Company some other passenger cars pulled in behind the tank truck. When the group of vehicles reached the traffic circle on the northern outskirts of El Dorado, the driver of the white vehicle blocked the road. It developed that the drivers for Wheeling Pipeline were on strike at the time. The men in the passenger cars were watching out for what they called "bootleggers" for Wheeling, that is, those obtaining fuel oil from other refineries to circumvent the effects of the Wheeling strike. It was testified by one of the pickets that CRT's truck "wore all the earmarks of a Wheeling truck." Therefore the strikers wanted to make inquiry of Craig relative to his employment, ownership of the truck, and other matters that might determine whether the strikers' ef-

forts were being thwarted.

The pickets detained Craig for a matter of several minutes, questioning him concerning matters relative to their mission. During that interim some of the numerous pickets were around the sides and the rear of the tanker truck. Craig was not molested and never got out of the truck. He did testify that one of the pickets remarked that Craig was "liable to get hurt." Craig produced no papers to show his non-connection with Wheeling, and it can be reasoned that he was permitted to leave under a cloud of suspicion.

From the time Craig left the traffic circle until his next stop, which was forty-three miles north and at the Thornton weight station, a continuous stream of fuel oil flowed from his truck. There is a large valve in the center-rear of the tank and it controls flowage through a pipe that protrudes from under the chassis and within a few feet of the pavement. It is the main control valve on the tank and is used to unload the fuel oil. The valve is worked manually by a wheel which is not locked. It should be noted that most of the oil was spilled in Craig's lane of traffic, the main exception being in banked curves, where it would sometimes fall near the center line and drift into the opposite lane. When alerted by the inspector at the weight station, Craig discovered that the control valve was wide open. It is not claimed that the valve was defective. In fact, appellant's proof, which was not rebutted nor seriously controverted on appeal, strongly indicated that the valve was opened by some unknown person or persons at the traffic circle. Unquestionably the jury could have so concluded. The flow of oil started at the traffic circle where a puddle of oil was laid down. Incidentally, the State Highway Department was alerted and its employees began a sand-covering operation on the south end at around two o'clock in the morning.

Appellees, Mr. and Mrs. Dunn, lived near Hampton, which is on the El Dorado-to-Thornton highway

and some fifteen miles south of Thornton. Mrs. Dunn left Hampton by car around seven o'clock that morning destined for her work in El Dorado, some twenty-eight miles to the south. She testified that she noticed the oil as she turned on the highway at Hampton; that both lanes of the highway were open and being traveled in good daylight; and that after traveling some twelve miles she overtook and passed a transport truck after some difficulty. She said that after passing that vehicle she shortly entered a curve and there was oil in her lane; that just ahead of her was a pickup truck and the highway department sanding crew with warning flashing lights; that she necessarily applied her brakes and that caused her to start skidding. She lost control and her vehicle crossed the shoulder and came to rest in a ditch.

Appellant first attacks appellees' evidence as being insubstantial. Was the jury warranted in finding that Craig was put on such notice as would dictate to a driver of ordinary prudence that he should check his rig for vandalism once he was safely away from the strikers? If the answer is in the affirmative, then the evidence was substantial, otherwise not. We have carefully explored the problem posed by the crucial question and have concluded that there was sufficient evidence which would warrant a jury's finding in the affirmative. Craig's testimony, and attendant circumstances, are the principal sources of the supporting evidence. Those elements, summarized in the light most favorable to appellees, are these:

From the moment Craig left Lion Oil around 10:00 p.m. he was shadowed by a white car; as they passed Wheeling Pipeline some four more cars of strikers, on signal from the white car, joined in; they tried to stop Craig before he reached the south side of the business district; Craig kept going because he calculated they were strikers and he was apprehensive of what might happen; they apparently made no effort to stop Craig in downtown El Dorado, waiting until they reached the traffic circle on the north side of town, a more

secluded spot; there the strikers threw up a roadblock and detained Craig for some twenty or thirty minutes; while one or more leaders engaged him in inquisitorial and accusative conversation, others milled about the truck; one leader remarked that Craig could get hurt; and the fact that his truck bore no identification markings and the refusal of Craig to show his lease papers served to increase the suspicion that he was "bootlegging."

As previously mentioned, one of the strikers testified that Craig's rig "wore all the earmarks of a Wheeling truck." It is therefore not an unreasonable inference that the strikers concluded that they had spotted a driver who was aiding and abetting Wheeling. The attitude of the strikers toward "bootleggers" was expressed by the witness in this language: "It's like taking bread out of our mouths." Undoubtedly Craig found himself in an atmosphere of antagonism. It is also fairly inferable that Craig never convinced the strikers that he had no connection with Wheeling.

It should also be pointed out that the outlet valve is opened by the turning of a wheel which is approximately the size of a steering wheel. It is opened and closed by hand and is not locked. It can be operated by a man standing on the ground.

When Craig was asked on cross-examination why he did not stop and check the truck, he replied that it was because of the threat that he was "liable to get hurt." He never did explain why he did not stop when he reached a reasonably safe distance from the encounter. In fact, the jury may have concluded from Craig's overall actions that his interest in leaving El Dorado far behind him was his exclusive concern. Between El Dorado and the Thornton weight station, Craig lost 4,300 gallons of oil. Of course that represented a very substantial reduction in load, he being left with only 1,000 gallons. Secondly, at some undetermined point between El Dorado and Thornton, Craig's motor developed a leak in the oil line. It was

first discovered when the truck was stopped at the weight station. "I got back around this side of my truck, and I looked up there at the motor, and oil was pouring out." Would a reasonably alert driver, losing 100 gallons of fuel oil per mile and operating with a serious defect in his fuel line, not have more timely discovered either or both defects? That is a question the jury could have answered in the affirmative.

Craig testified that the thought never entered his mind that anyone would tamper with his truck. Our interest is directed at what a reasonably prudent driver would have foreseen as likely to have happened because that is the standard by which Craig is to be judged. The jury, by its verdict, decided that the likelihood of some tampering by the strikers was reasonably foreseeable and we cannot say there is no substantial evidence to support that conclusion.

Appellant contends that Mrs. Dunn was negligent and that her conduct was the sole proximate cause of the mishap. It is also asserted that she assumed the risk of her own injuries. Under conflicting evidence the jury answered those questions in the negative and we cannot say as a matter of law that it was error. Mrs. Dunn knew of the presence of the oil, knew it was slick, and observed that it ran over on her side of the highway in the curves. It can be logically argued that a more prudent driver would have exercised more caution with respect to speed and in approaching and passing other vehicles. However, she testified that because of the circumstances she did not exceed fifty miles per hour, which she presumably considered a safe speed under the circumstances. It is true she overtook and passed a transport truck but it is not shown that movement contributed to cause the accident. Just before she lost control the highway, she said, curved to her right; that about the time she rounded the curve she saw a pickup truck which she judged to be moving rather slowly; that at the same time she observed the highway department sanding crew; and that as a matter of precaution she applied her brakes to slow down and

her car skidded into the ditch. Whether in that emergency she was negligent was for the jury. For all we know the jury did find her guilty of some negligence because the general verdict was far less than the amount sought.

With further respect to the argument of assumption of risk, we point out that the evidence shows the highway to have been open to traffic in the usual manner, that there was a normal flow of vehicles, and no evidence of other accidents.

For the error we find in the giving of Court's Instruction No. 20 we reverse and remand the case. That instruction is as follows:

There was in force in the State of Arkansas at the time of the occurrence a statute which provided:

'No vehicle shall be driven or moved on any highway unless such vehicle is so constructed or loaded as to prevent any of its load from dropping, sifting, leaking or otherwise escaping therefrom, except that sand may be dropped for the purpose of securing traction, or water or other substance may be sprinkled on a roadway in cleaning or maintaining such roadway.' (Ark. Stats. 75-805).

A violation of this statute, although not necessarily negligence, is evidence of negligence to be considered by you along with all of the other facts and circumstances in the case.

The quoted statute is concerned only with the *construction* and *loading* of a vehicle. Neither the construction of the vehicle nor the manner in which it was loaded was an issue at the trial. It is seemingly appellees' theory that the instruction is applicable anytime there is a leakage or escaping of loaded materials from a truck which is traveling on the highway. That fact is not sufficient. There first must be some evidence that the spillage was caused either by the construction

or loading.

Since the instruction had no connection with any of the trial issues it must be condemned as being abstract. We have reversed a number of cases for the giving of abstract instructions, particularly in situations where we cannot tell but that the jury verdict was affected by the error. *Vangilder* v. *Faulk*, 244 Ark. 688, 426 S. W. 2d 821 (1968); *Harkrider* v. *Cox*, 230 Ark. 155, 321 S. W. 2d 226 (1959).

Reversed and remanded.