Dr. Manuel KELLEY, et al. *v.* Alvis WIGGINS,
Administrator of the Estate of Melinda Wiggins

86-117 724 S.W.2d 443

Supreme Court of Arkansas
Opinion delivered February 23, 1987
[Rehearing denied March 23, 1987.]

*Friday, Eldredge & Clark*, by: *Phillip Malcom*, for appellant Dr. Manuel Kelley.

*Barber, McCaskill, Amsler, Jones & Hale, P.A.*, for appellant Ambassador Ins. Co.

*Daggett, Van Dover, Donovan & Cahoon*, by: *Jimason J. Daggett*, for appellants Lee Memorial Hospital and St. Paul Fire and Marine Ins. Co.

*George Bailey*, and *Foehner & Vuylsteke*, by: *Kenneth K. Vuylsteke* and *Charles E. Foehner, III*, for appellees.

DAVID NEWBERN, Justice. This is a wrongful death case. The appellants, Dr. Manuel Kelley, Lee County Cooperative Clinic, and Lee Memorial Hospital were allegedly negligent in their treatment of Melinda Wiggins, causing her to die as the result of eclampsia, a condition involving hypertension, which occurs in pregnant women. The clinic and the hospital were immune from suit, so their insurers, appellant Ambassador Insurance Company for the clinic and appellant St. Paul Fire and Marine Insurance Company for the hospital, were sued directly pursuant to Ark. Stat. Ann. § 66-3240 (Repl. 1980).

The appellees sought damages of $2,000,000. Based on the jury's verdicts, the court's judgment awarded damages in favor of Hope Wiggins, the daughter born of the fatal pregnancy, for $325,000; Frances Graham, Melinda's mother, for $100,000; Alvis Wiggins, Melinda's husband, for $75,000, and Melinda Wiggins's estate for $300,000. The total of $800,000 was adjudged against Dr. Kelley, St. Paul Fire and Marine Insurance Company, and Ambassador Insurance Company. The judgments against the insurance companies were limited to $300,000 (St. Paul) and $100,000 (Ambassador), the limits of their liability insurance coverage.

The appellants have raised a number of points for reversal. In none of their arguments do we find sufficient merit to require reversal of the judgments based on jury verdicts against each of them.

As the two insurer appellants assert that the evidence was not sufficient to support the verdicts, we will state the facts we find to be supported by the evidence. We view the evidence most favorably to the appellees, and we will affirm if there is any substantial evidence to support the verdicts. *Arkansas Louisiana Gas Co. v. Hutcherson*, 287 Ark. 247, 697 S.W.2d 907 (1985); *Handy Dan Home Improvement Center, Inc. v. Peters*, 286 Ark. 102, 689 S.W.2d 551 (1985).

Melinda Wiggins gave birth to a child in 1975. During that pregnancy she made visits for prenatal care to the clinic. In the opinion of an expert who testified for the appellees, her clinical records showed a normal pregnancy except for blood pressure readings showing she suffered hypertension. Her hypertension was noted on the records of the University of Arkansas Medical Center where she gave birth in 1975.

After that pregnancy Melinda returned to the clinic to obtain help with contraception. Clinic records showed her blood pressure had returned to normal. In late 1977 or early 1978 she became pregnant again, and she again made prenatal visits to the clinic. She was seen there by a woman she and members of her family thought was a physician but who was a physician's assistant, Pat Krueger. They called her Dr. Krueger or Dr. Pat. Melinda, during her second pregnancy, was not seen by a physician at the clinic either on her first visit or any subsequent visit. Appellant Dr. Kelley was the medical director of the clinic, and he initialled the reports prepared by Krueger with respect to Melinda's visits. No notation was made of the hypertension Melinda experienced in her first pregnancy.

Appellee Frances Graham, Melinda's mother, noticed in May, 1978, that Melinda was beginning to suffer edema, with swelling not only in her feet, but in her legs, arms, hands, and face. She was complaining of headaches and nausea and pain in her upper abdomen. The edema progressed, and the other symptoms became worse in June. She visited the clinic but was given no dietary advice or diuretic. In her first pregnancy she had been

placed on a salt-free diet. Melinda visited the clinic on July 10, 1978. On July 14, she complained to her mother of her pain. It was suggested by her mother that she return to the clinic. She called the clinic, but Pat Krueger was not there. She was told to come in on Monday, which would have been July 16. On the night and early morning of July 14 and 15, 1978, Melinda's pain and nausea became so severe that her husband, appellee Alvis Wiggins, took her to the emergency room at the Lee Memorial Hospital.

Dr. Kelley was at the hospital. He examined Melinda and ordered a laboratory test of her blood. She was unable to give a urine specimen, and Dr. Kelley did not order that one be taken by catheterization. In addition to her other complaints, Melinda told the doctor of stuffiness in her head as well as pain near her right shoulder blade.

Dr. Kelley found her blood count, pulse, and blood pressure were normal. He apparently was unable at that time to compare her blood pressure with her clinic records, however, as he called Pat Krueger from the hospital and asked her about any changes in Melinda's blood pressure. He also asked whether Melinda had previously had any protein in her urine. Pat Krueger answered she had not. On the hospital record Dr. Kelley listed three possible diagnoses: cholecystitis, upper respiratory infection, and pre-eclampsia. The signs of pre-eclampsia are high blood pressure, edema, and protein in the urine. Pre-eclampsia becomes eclampsia when a seizure or convulsion occurs.

Melinda was released from the hospital at approximately 3:30 a.m. on Sunday, July 16, 1978, with a prescription for ampicillin and Robitusin for her cold. She returned home with her husband where she suffered her first convulsion at about 6:00 a.m. She was rushed back to the hospital and admitted. Marty Roberts, a nurse employed by the hospital, called Dr. Kelley to say Melinda was there. He did not tell the doctor that she had suffered a convulsion. Dr. Kelley said he would come in to the hospital "after a while." Dr. Kelley received a second call, this one from Nurse King at the hospital, in which he was told Melinda was having a seizure. He prescribed valium and rushed to the hospital where he began making arrangements to have Melinda transferred to a larger hospital. She ultimately was sent

by ambulance to the University of Arkansas Medical Center at Little Rock.

When Melinda was admitted to Lee Memorial Hospital, she was not constantly attended. When one of two seizures she suffered at the hospital began, a nurse had to be summoned to her room to place in her mouth a device to keep her from gagging on her tongue.

For the trip to Little Rock, Dr. Kelley testified he gave more valium to the ambulance attendants, but the hospital record did not show it. Melinda suffered at least one additional seizure on the way. When she arrived at the Little Rock hospital she was given magnesium sulfate. Magnesium sulfate, the preferred drug for treatment of convulsions, was available at Lee Memorial Hospital. She was delivered of her child, appellee Hope Wiggins, by Caesarean section. Melinda then lapsed into a coma and died on July 29, 1978. Hope's premature birth required she be kept at the Little Rock hospital for two months, and, although she is now able to function almost normally, she has lingering respiratory problems.

We will address each argument raised by each appellant or combination of appellants. First we will discuss each appellant's contentions bearing on the determination of liability, and then we will discuss their arguments that the damages awarded were improper.

### 1. Dr. Kelley

#### a. Improper references to insurance

Dr. Kelley contends two medical expert witnesses were asked questions which implied that he was insured against medical malpractice claims. His contention is that these improper questions were asked in a trial which was permeated with references to insurance due to the fact that it was a direct action against two insurance companies. He argues that the appellees' counsel intentionally mentioned insurance numerous times to inflame the jury into awarding large amounts of damages.

The appellants seem to recognize there was no way that references to insurance could have been kept out of the trial in view of the fact that the action was against two insurers. Thus,

they have focused on the questions they argued implied insurance coverage of Dr. Kelley. The first question noted was asked of Dr. Whaley who was called as a witness for Dr. Kelley. He was asked and answered as follows:

Question: Doctor do you know this lawsuit is against St. Paul Insurance Company?

Answer: I have heard you say that.

Question: Is that the biggest malpractice insurance carrier in Arkansas?

Upon objection by Dr. Kelley's attorney, a conference out of the jury's presence was held, and, in effect, the objection to the question was sustained. Upon returning to open court, the question was withdrawn. The judge asked the jurors if they could ignore the question, and they indicated they could.

The second specific instance of which Dr. Kelley complains occurred when counsel for the appellees cross-examined a Dr. Ransom about his malpractice insurance. He was asked whether he had insurance coverage with St. Paul. He said he did not know. He was then asked if his insurance premium would increase if a large judgment were awarded against a doctor. He said he did not know.

Dr. Kelley cites *Shamblin* v. *Albright*, 278 Ark. 565, 647 S.W.2d 470 (1983), and *Hively* v. *Edwards*, 278 Ark. 435, 646 S.W.2d 688 (1983), in each of which we held the trial court did not abuse its discretion by precluding questions which would have alerted the jury that a defendant physician was covered by malpractice insurance. A reading of those cases makes it clear that we have no absolute prohibition against allowing the mention of insurance in malpractice actions. In both instances the trial court excluded the evidence, and we held the appellants had not shown that the probative value of the showing of insurance coverage outweighed the prejudicial effect of that evidence. Here the trial judge, in effect, sustained the objection to the question to Dr. Whaley and overruled it on the question to Dr. Ransom. We find no abuse of discretion.

As Dr. Kelley notes in his brief, this trial was already permeated with the presence of two insurer defendants. The

question to Dr. Whaley was disallowed. While it is true that Dr. Ransom was primarily a witness for Dr. Kelley, he also testified that the hospital actions were appropriate. Thus he was testifying in favor of St. Paul. Whether he was insured by St. Paul thus was to some degree relevant to impeachment of his testimony. The trial judge might have sustained the objection to the question on the basis that the effect of one judgment on the company's rates was too remote and thus its prejudicial effect outweighed its probative value, see *Mendoza* v. *Varon*, 563 S.W.2d 646 (Tex. Civ. App. 1978), but he did not. We find no abuse in these circumstances.

### b. Use of deposition

Valerie Mitchell, a sister of Melinda Wiggins, testified that Melinda was left in her room unattended by Dr. Kelley and the nurses at Lee Memorial Hospital. Counsel for Dr. Kelley contends he was not permitted to question Mitchell on the basis of statements made by Alvis Wiggins in a pretrial deposition. Dr. Kelley argues, and Ark. R. Civ. P. 32(a)(2) provides, that the deposition of a party may be used by an adverse party for any purpose.

We can find no ruling by the court refusing to allow Valerie Mitchell to be cross-examined on the matters Alvis Wiggins testified to in his deposition. Rather, there was a series of questions to which the court sustained intermittent objections of repetitiveness. In post-trial colloquy with counsel, the court referred to the questions as argumentative, but at no point does it appear that there was a refusal to allow the deposition to be read or otherwise used by counsel for Dr. Kelley.

In his deposition Alvis Wiggins did not say the doctor or the nurses were with Melinda in her room constantly. He said only that they were there. Thus the deposition was not a strong, direct contradiction of Valerie Mitchell's testimony. In addition, the information from the deposition came into evidence when the deposition was used to cross-examine Alvis Wiggins. He testified his deposition contained his statement that Dr. Kelley "stayed pretty much with Melinda and there were nurses with her when he was not there." In response to cross-examination at the trial, he testified that they were not present in Melinda's hospital room at all times.

■ Even if we could say the court limited the use of the deposition, and if we could find that the limitation constituted error, it was hardly prejudicial in view of the fact that, to the extent the deposition contradicted Mitchell's testimony, it was placed before the jury later in the trial.

### c. Dr. Smith's testimony

Expert witnesses for the appellees testified that Melinda should have been given magnesium sulfate rather than valium to control her seizures. Expert witnesses for the appellants testified that valium was entirely appropriate. One of the latter witnesses was Dr. Lander Smith who was training at the University of Arkansas Medical Center in 1978. Dr. Smith testified he was familiar with transfers to the University of Arkansas Medical Center. He said that when a transfer occurs the referring physician speaks with a specialist there and he (presumably the specialist) will state what is best for the patient and will give suggestions for the patient during the transfer. Dr. Kelley's counsel then asked Dr. Smith this question:

> Question: "Dr. Smith, let me ask you: From your knowledge of this case and research of things you have done, do you know what the recommendations were, even of the neurologist at the medical center, for transfer of seizuring patients in 1978, particularly as to what medication to put them on for the time of transfer?"

The court sustained a hearsay objection. However, in response to the next few questions Dr. Smith was allowed to testify that in his opinion valium was an appropriate drug to be used in the transfer of a patient with Melinda's symptoms and that that had been his "feeling" in 1978.

■ In post-trial discussion of his ruling on the hearsay objection, the judge noted the question lent itself to being interpreted as asking what Dr. Kelley was told by a specialist in this case. We agree that was a possible interpretation of the question. That makes irrelevant Dr. Kelley's argument that an expert may rely on hearsay in forming his opinion. *See* A.R.E. Rule 703. Dr. Kelley got the benefit of Dr. Smith's opinion testimony on whether valium was appropriate, but he was not necessarily entitled to have Dr. Smith testify in a way that would

suggest what Dr. Kelley was told in this case. The judge concluded the danger that the jury might reach such a conclusion made the prejudice of the proposed testimony outweigh its probative value. We cannot say he abused the discretion granted him by A.R.E. Rule 403.

### d. Accord and satisfaction

After the trial counsel for the appellees wrote to counsel for the appellants demanding they pay over the insurance policy limits as to each insured and stating that if the payments were promptly made, interest and claims for excess would be waived. Counsel for Dr. Kelley promptly tendered $100,000 as complete payment of his liability as that was the amount of his malpractice limit. The appellees refused the tender, and Dr. Kelley moved the court to enter an "accord and satisfaction" order. He contends it was error for the court to refuse to do so.

We find no merit in this argument. In their letter to the appellants, the appellees stated, "[b]efore we can accept payment, however, we will need to see certified copies of the policies and face sheets." The letter referred further to "settlement drafts and policies," clearly indicating the appellees' intention to settle with all of the appellants on the basis of the limits of all policies rather than just the one covering Dr. Kelley. There was no such tender by the appellants, and there clearly was no acceptance of a tender by the appellees. Accord and satisfaction will constitute a defense to litigation if the award sought has been tendered and accepted, but not otherwise. *See St. Louis Southwestern Ry. Co.* v. *Mitchell,* 115 Ark. 339, 171 S.W.2d 895 (1914). Whether or not "accord and satisfaction" is applicable, it is clear that no enforceable settlement contract was made between the parties to the judgment before us. Dr. Kelley's tender of $100,000 was not a tender of performance in the terms stated in the appellees' offer.

### 2. St. Paul Fire and Marine Insurance Co.

Other than its adoption of co-appellants' arguments which are discussed elsewhere, St. Paul raises only the issue of whether there was evidence sufficient to go to the jury showing negligence on the part of Lee Memorial Hospital. St. Paul's argument is that the appellees did not establish by competent medical witnesses

that the alleged "failures" of the hospital to meet the requisite standard of care existed and were a proximate cause of death. Our task is not, however, to determine those questions. Rather, it is to determine whether there was sufficient evidence produced by the appellees to permit the case to go to the jury. *See Chrestman* v. *Kendall*, 247 Ark. 802, 448 S.W.2d 22 (1969).

There was ample testimony, albeit disputed, that the hospital left Melinda unattended after she was placed in a room on her second visit to the hospital. Dr. DeAlvarez, a medical expert witness for the appellees, testified that failure to attend a post-seizuring patient continuously was below the reasonable standard of care for a hospital in a community similar to Marianna, Arkansas, which is where Lee Memorial Hospital is located. He said this "failure" among others would have contributed to Melinda's death.

The evidence also tended to show the hospital was at fault in not getting Dr. Kelley to the hospital sooner after Melinda's second admission. Dr. Kelley testified that when he was called by Nurse Marty Roberts upon Melinda's return to the hospital, he was not informed that Melinda had suffered a seizure, although Roberts's notes showed "Presents with complaint of choking on tongue, seven months pregnant now. Apparently seizuring activity. Dr. Kelley notified. Admit, I'll be there later." Dr. Kelley testified that had he been told Melinda had suffered a seizure he would have come to the hospital much quicker.

From the medical expert testimony the jury could have concluded Melinda's death was caused by the effect of the seizures which temporarily stopped the flow of oxygen to her brain. Had nurses been in continuous attendance, they could have facilitated Melinda's breathing in the second and third seizures. Had Dr. Kelley arrived sooner he could have prescribed for her sooner. There was thus sufficient evidence for the jury to find negligence on the part of the hospital and that it was the proximate cause of Melinda's death.

### 3. *Ambassador Insurance Company*

Ambassador Insurance Company makes only one argument not dealt with elsewhere in this opinion. It is phrased simply in terms of the insufficiency of the appellees' evidence to show the

Lee County Cooperative Clinic's acts were the proximate cause of Melinda's death. The argument has two parts, however. First, it is contended "there is absolutely no evidence that any acts or omissions of Pat Krueger or the clinic proximately caused the death of Melinda Wiggins." Second, it is contended there was intervening cause such that even if negligence were found on the part of the clinic, the clinic could not be liable.

### a. The clinic's negligence

Dr. DeAlvarez testified it was below the standard of care for a prenatal clinic in a community similar to Marianna, Arkansas, to have failed to identify Melinda as a high risk patient, not to have provided a physician to examine her, not to have noted her excessive weight gain, and not to have taken measures to control weight gain. He further said it was below the standard of care for the clinic to have failed to hospitalize Melinda on July 10, 1978, and to have given her Sudafed, a drug which constricts blood vessels.

Ambassador points out that Dr. DeAlvarez acknowledged stating in his deposition that he could not have diagnosed Melinda as pre-eclampsic based on the clinic's records, and that Dr. Medlin, another plaintiff's expert, said he would not have thought Melinda a high risk patient.

We cannot say that the cross-examination in Dr. DeAlvarez's deposition or the testimony of Dr. Medlin was so devastating to Dr. DeAlvarez's clear testimony that the clinic was at fault as to make it insufficient as a basis for the jury's consideration of the case. The fact that he could not have diagnosed Melinda as being pre-eclampsic from the clinic's records is, in this instance, not inconsistent with Dr. DeAlvarez's criticism of the clinic's records which had not noted her as being a high risk patient whose previous pregnancy had been marked by hypertension. This leads to the argument that, given a finding of negligence by the clinic, it could not have proximately caused her death in view of the intervening acts of Dr. Kelley and the hospital.

### b. Intervening cause

Ambassador is correct in asserting there was evidence upon which the jury might have found the acts of Dr. Kelley and the hospital were such that the clinic was absolved by intervening cause as described in Restatement (Second) of Torts § 452(2) (1965):

> Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause.

The comment to this subsection contains the following:

> Subsection (2) covers the exceptional cases in which, because the duty, and hence the entire responsibility for the situation, has been shifted to a third person, the original actor is relieved of liability for the result which follows from the operation of his own negligence. The shifted responsibility means in effect that the duty, or obligation, of the original actor in the matter has terminated and has been replaced by that of the third person.

However, the jury did not so find. Ambassador does not question the instruction given to the jury on this point, A.M.I. 503. That instruction makes it clear that the burden of proof on intervening cause rests with the party asserting it, in this case Ambassador.

In *W. M. Bashlin Co.* v. *Smith*, 277 Ark. 406, 643 S.W.2d 526 (1982), we said:

> The foregoing instruction placed the matter of independent intervening cause squarely before the jury. This is all that appellant could expect under the facts of this case. It may be said that the general rule is that the intervening act or omission of a third person is not a superseding cause when the original actor's negligent conduct is a substantial factor in bringing about the injury. If the intervening act is a normal response to the situation created by the original actor's conduct, then there is no intervening cause. When the negligent acts of the parties are concurrent, there is no intervening cause which bars recovery against the original

actor. . . . [277 Ark. at 419, 643 S.W.2d at 532].

The state of the evidence in this case was such that the jury could have concluded the acts of Dr. Kelley at the hospital were the "normal response to the situation created by" the clinic's failure to have noted Melinda was a high risk patient. The evidence was sufficient for the jury to have concluded that Dr. Kelley, who was the medical director of the clinic, continued to rely on the clinic and Pat Krueger even during the hospital episode. Nothing in Ambassador's evidence compels the conclusion that there was intervening cause or that the clinic's negligence was not an essential link in the chain of causation. *See Arkansas Kraft Corporation* v. *Johnson*, 257 Ark. 629, 519 S.W.2d 74 (1975).

## 4. Damages

Each of the appellants contends that the awards in favor of Melinda's mother, Frances Graham ($100,000), husband, Alvis Wiggins ($75,000), and daughter, Hope Wiggins ($325,000), were not based upon substantial evidence but were the result of passion and prejudice on the part of the jury. In addition, Dr. Kelley contests the award to Melinda's estate ($300,000) on the same basis. We are asked to enter remittiturs.

In *St. Louis Southwestern Railway Co.* v. *Pennington*, 261 Ark. 650, 553 S.W.2d 436 (1977), Justice Fogleman conducted an exhaustive survey of our cases dealing with the manner in which we review damages awarded for mental anguish in wrongful death cases. The opinion distilled a number of factors which we have since followed in evaluating these awards. *Martin* v. *Rieger*, 289 Ark. 292, 711 S.W.2d 776 (1986). The factors are:

(1) The duration and intimacy of their relationship and the ties of affection between decedent and survivor.

(2) Frequency of association and communication between an adult decedent and an adult survivor.

(3) The attitude of the decedent toward the survivor, and of the survivor toward the decedent.

(4) The duration and intensity of the sorrow and grief.

(5) Maturity or immaturity of survivor.

(6) The violence and suddenness of the death.

(7) Sleeplessness or troubled sleep over an extended period.

(8) Obvious extreme or unusual nervous reaction to the death.

(9) Crying spells over an extended period of time.

(10) Adverse effect on survivor's work or school.

(11) Change of personality of the survivor.

(12) Loss of weight by survivor and other physical symptoms.

(13) Age and life expectancy of the decedent.

[289 Ark. at 296; 711 S.W.2d at 778]

### a. Frances Graham

Mary Weedham, Melinda's sister, testified that Melinda and their mother had a special relationship, and their closeness increased during the illness which led to the death of Melinda's first child at age eighteen months. Frances Graham is raising Hope Wiggins in the atmosphere of loss created by Melinda's death. In addition, as noted earlier, Frances Graham was a witness to Melinda's suffering in the last month of her life and to the ultimate torment of her convulsions which the jury apparently concluded could have been avoided. There was strong evidence implicating the first six and the thirteenth factors listed above, and we cannot say there was no basis for the jury's award.

### b. Alvis Wiggins

We find equally strong evidence in support of the award to Alvis Wiggins. He and Melinda were childhood sweethearts, and he had been Melinda's only boy friend. They married when he was discharged from the Air Force. Melinda was then seventeen. Mary Weedham testified as to their close relationship, stating that Alvis and Melinda were together constantly. She also testified about the effect of Melinda's death on Alvis. When Hope came home from Little Rock at age nine weeks, Alvis lived with Frances Graham and Hope. He was in such a state of "shock" that he could not work.

Alvis testified that he could not work as a roofer, although he

had a job. He testified he was unable to eat for a time, and that during the first few months after Melinda's death he was unable to accept it and still does not.

Alvis testified that despite Melinda's accelerating health problems he tried to enjoy his life with her. When she suffered her seizure at home, the skin was torn on the finger he used to try to keep her from choking on her tongue. He was with her through her seizures at Lee Memorial Hospital and was at the hospital in Little Rock during her final comatose two weeks, hoping she would show life signs.

We find evidence that factors (1) through (6), (10), and (13) were present and that the jury was justified in its award to Alvis Wiggins.

### c. Hope Wiggins

The appellants correctly point out that Melinda's employment record was hardly such as to support a finding that she would have made a financial contribution to Hope sufficient to support the award of $325,000. As the appellants say, the award must have been based primarily on Hope's loss of parental guidance from the mother who died so shortly after Hope's birth.

As the appellees correctly point out, the evidence of Melinda's experience with her other child during its eighteen-month battle with congenital brain tumors displayed her capacity for love and parental care adequately. It is, of course, difficult to place a value on an individual parent's prospective contribution to raising a child who has suffered substantial health problems related to her premature birth. In our view, the jury is in a far better position than we to do so. The only basis for the appellants' allegation that the award was the result of the jury's passion and prejudice is that they were aware of the insurance. As noted early in this opinion, that awareness was unavoidable. Given the evidence of the mothering capacity of Melinda Wiggins and the task she would have faced with Hope, we are not in a position to say the size of the award shows that the knowledge that insurance companies were involved caused passion and prejudice in the jurors. Nor can we say that the love, care, and guidance of a mother during what would have been her normal lifetime is necessarily worth less than $325,000.

 The appellants have asked that we compare jury awards in other cases, such as: *Bridges* v. *Stevens*, 238 Ark. 801, 384 S.W.2d 490 (1964), and *Carr* v. *St. Paul Fire & Marine Ins. Co.*, 384 F.Supp. 821 (W.D. Ark. 1974), in which the awards were much smaller. In *Clark County Lumber Company* v. *Collins*, 249 Ark. 465, 459 S.W.2d 800 (1970), we said:

> Every case involving the issue of an excessive verdict must be examined on its own facts; and before this court can constitutionally reduce a verdict we must give the evidence in favor of the verdict its highest probative force and then determine whether there is any substantial evidence to sustain the verdict. *Breitenberg* v. *Parker*, 237 Ark. 261, 372 S.W.2d 828.
>
> . . .
>
> This court is considerably limited in determining whether a jury award is excessive. A jury and the trial court have an advantage over us in seeing and hearing the witnesses as they testify and their testimony is weighed. We are unable to rely on awards made in other cases in determining whether an award of damages in a given case is excessive because a comparison of awards made in other cases is a most unsatisfactory method of determining a proper award in a particular case, not only because the degree of injury is rarely the same, but also because the dollar no longer has its prior value. [249 Ark. at 476, 477; 459 S.W.2d at 805.]

### d. Melinda Wiggins's estate

Dr. Kelley argues that any damages to Melinda's estate beyond funeral expenses are based on rank speculation at best, and passion and prejudice at worst, because there is no evidence of conscious pain and suffering on her part which he could have prevented. Of course, whether he could have prevented the seizures she suffered is part of the question of liability. Here the only question we address is that of damages.

We have no doubt the jury could have found great suffering on the part of Melinda during the last month of her life. We are not convinced by Dr. Kelley's argument that because she was comatose for the last two weeks she did not suffer. We need not

repeat the graphic testimony of the witnesses with respect to Melinda's final illness and the accompanying convulsions. It is enough to say the evidence was clearly sufficient to serve as the basis of the jury's award of $300,000.

Affirmed.