MISSOURI PACIFIC RAILROAD COMPANY and
Union Pacific Railroad Company *v.* Betty L. MACKEY,
Executrix of the Estate of Cleo Franklin Mackey, Deceased

88-90 760 S.W.2d 59

Supreme Court of Arkansas
Opinion delivered November 21, 1988
[Rehearing denied December 19, 1988.]

138

*Herschel H. Friday, Michael G. Thompson*, and *Elizabeth J. Robben*, for appellant.

*Walters Law Firm, P.A.*, by: *Bill Walters*, for appellee.

JOHN I. PURTLE, Justice. This is an appeal from a jury verdict and judgment in a wrongful death case. The death resulted from a pickup truck and train collision at a railroad and highway intersection. The verdict and judgment in favor of the appellee totaled $550,000.00. The appellant argues seven points for reversal: (1) the trial court erred in refusing to direct a verdict in favor of the defendants on the issue of causation; (2) the trial court erred in submitting the whistle and bell issue to the jury; (3) the trial court erred in submitting the issue of conscious pain and suffering to the jury; (4) the trial court erred in submitting the issue of punitive damages to the jury; (5) the Arkansas vegetation statute is preempted by federal law and the trial court erred in instructing the jury on the statute; (6) the trial court erred in its evidentiary rulings; and (7) Union Pacific railroad company should have been dismissed as a defendant. Although the case is reversed and remanded, it is necessary to discuss all of the points raised to provide guidance at the second trial.

Cleo Mackey was driving his pickup truck south on Highway 41 in Franklin County, Arkansas, about 1:50 p.m., on July 27, 1984, when it collided with an eastbound Missouri Pacific train. Mackey died shortly thereafter as a result of injuries received in

the collision. There was testimony to the effect that the truck was traveling south at a speed between 20 and 40 miles per hour immediately prior to the collision. The uncontradicted testimony was that the engineer blew the whistle and sounded the bell when the train was somewhere between 250 and 1500 feet west of the intersection of the railroad and Highway 41.

The pickup left 38 feet of skid marks prior to stopping, with the front end of the truck in the center of the railroad tracks. Expert testimony indicated that the pickup was driving between 20 and 30 miles per hour when the brakes were applied. Also, expert testimony indicated that the truck would have stopped prior to reaching the track if it had not been for loose gravel on the highway. The highway had been treated with hot asphalt and loose gravel on the date of the collision.

Evidence reveals that the railroad had allowed trees and underbrush to grow on the railroad right-of-way near this highway and railroad crossing. The exact distance at which a train could be observed from the highway was not established. Of course, as a vehicle approached the track, the driver could see farther down the tracks and the converse is true as it relates to the engineer operating the train.

A model built at the appellee's request and introduced at the trial portrayed the railroad right-of-way as being heavily overgrown with shrubs and trees. Also, ground level and area photographs of the scene were introduced into evidence. An eyewitness to the occurrence observed the vehicle approaching from the north several hundred feet before it reached the intersection. At the same time, he heard the train whistle and observed the train some 250 feet west of the intersection. He was the first person to the scene and observed the decedent as he was immediately after the occurrence. He was at the vehicle within seconds after the collision and observed the decedent lying partly in the floorboard and partly in the seat of the truck. He could not see the injured party's eyes but his arms were jumping and he was shaking a little bit. He was making a noise when he breathed through his mouth and when he breathed through his nose. The witness stated: "He could not get enough air one way and would try another because he would make two different sounds." The vital signs of the decedent apparently stopped on the way to the

hospital, and he was resuscitated. The emergency room doctor, who pronounced him dead in the emergency room, stated that it was "most unlikely" that the decedent experienced any conscious pain and suffering.

## I. THE TRIAL COURT ERRED IN REFUSING TO DIRECT A VERDICT IN FAVOR OF THE DEFENDANTS ON THE ISSUE OF CAUSATION.

The appellant argues that the "sole proximate cause of the accident" was the presence of the loose gravel on the highway. There was strong evidence, both expert and otherwise, that the vehicle would have stopped prior to the collision had it not been for the loose gravel. However, the fact that he did not apply his brakes sooner, thereby being able to stop in spite of the loose gravel, may have been the result of an obstructed view caused by the growth on the railroad right-of-way. There was evidence from which the jury may well have found that the undergrowth prevented the decedent from observing the train at an earlier time and place. The burden of proving an independent intervening factor is with the party asserting it. *Kelley* v. *Wiggins*, 291 Ark. 280, 724 S.W.2d 443 (1987). Intervening negligence which bars recovery of the original wrongdoer has been discussed by this court in *Bashlin* v. *Smith*, 277 Ark. 406, 643 S.W.2d 526 (1982), and *Gatlin* v. *Cooper Tire and Rubber Company*, 252 Ark. 839, 481 S.W.2d 338 (1972). We held in *Bashlin* that an intervening act of negligence is no defense unless it is the sole proximate cause of the injury or damages and that a party may recover from the original actor if the negligence of the original actor was still a contributing factor. An independent intervening cause has been held to bar recovery from the original tortfeasor in the case of *Cowart, Adm'x.* v. *Jones*, 250 Ark. 881, 467 S.W.2d 710 (1971). See also, *Larson Machines, Inc.* v. *Wallace*, 260 Ark. 192, 600 S.W.2d 1 (1980). The growth on the railroad right-of-way was substantial evidence to allow the jury to find that it was a proximate cause of this occurrence. Whether both or either the negligence of the railroad or the highway department were proximate causes of the damage and injuries in this case were matters to be decided by the jury. *Hergeth* v. *Green*, 293 Ark. 119, 733 S.W.2d 409 (1987). When reviewing the denial of a directed verdict, we view the evidence in light most favorable to the appellee. *Boykin* v. *Mr. Tidy Car Wash, Inc.*, 294 Ark. 182, 741

S.W.2d 270 (1987). The trial court did not err in refusing to grant a directed verdict on causation.

## II. THE TRIAL COURT ERRED IN SUBMITTING THE WHISTLE AND BELL ISSUE TO THE JURY.

■ The engineer testified that he started sounding the whistle and bell when he was some fourteen to fifteen hundred feet from the intersection. He stated that he knew that he did so for at least thirteen hundred and twenty feet, which he knew was a quarter of a mile. Two independent witnesses testified that they heard the train whistle sounding before the occurrence. One of these witnesses never saw the train but the other witness witnessed the actual impact. This witness said the train whistle sounded while he was watching the pickup and when he looked toward the train it was about two hundred and fifty feet from the intersection. There was no testimony or evidence introduced to indicate that the whistle or bell did not sound. We recently decided a similar case in *Missouri Pacific Railroad Company* v. *Biddle*, 293 Ark. 148-A, 737 S.W.2d 625 (1987) (Opinion on rehearing). In *Biddle* we held that in the absence of any evidence that the bell was not sounded the matter should not have been presented to the jury. Since the trial court presented the issue to the jury, we reversed and dismissed because there was no other issue remaining. The testimony of the engineer and the witnesses in the present case was not contradicted. Therefore, it was error to present this matter to the jury. We held it was error to give an inapplicable instruction in *Hunter* v. *McDaniel*, 274 Ark. 178, 623 S.W.2d 196 (1981), and *CRT, Inc.* v. *Dunn*, 248 Ark. 197, 451 S.W.2d 215 (1970). Since the jury may have found that the train did not ring the bell or sound the whistle, thereby establishing proximate cause, we find prejudicial error.

## III. THE TRIAL COURT ERRED IN SUBMITTING THE ISSUE OF CONSCIOUS PAIN AND SUFFERING TO THE JURY.

■ Witness Gerald Clayton observed the accident and immediately went to the scene. Although he could not see the driver's eyes, he did see him making twisting and jerking movements and heard him making different noises through his mouth and nose. He indicated that when it would become more difficult for the victim to breathe through the mouth, he would

change to the nose and when that became difficult, he switched back to breathing through his mouth. There is some evidence, from the witness's observation, that the deceased was conscious. The emergency room doctor testified that it would have been "most unlikely" that Mr. Mackey experienced any conscious pain and suffering. The doctor's statement does not rule out the possibility that the decedent actually suffered conscious pain. Therefore, viewing the evidence in the light most favorable to the appellee, we cannot say that there was no substantial evidence supporting this instruction and that it should not have been presented to the jury. This is one of those issues which may not develop exactly the same at a second trial. Although the evidence in the matter was "very meager," we think it rose to the level of that found in the case of *Ashcraft* v. *Jerome Hardwood Lumber Company*, 173 Ark. 135, 292 S.W. 386 (1927). Our cases have dealt with the facts and circumstances of each case and relied heavily on the nature and extent of the injuries when determining whether conscious pain and suffering are recoverable. A question for the jury was established in this case.

## IV. THE TRIAL COURT ERRED IN SUBMITTING THE ISSUE OF PUNITIVE DAMAGES TO THE JURY.

There is no question that there was evidence that the railroad was negligent in not properly maintaining its right-of-way. However, the evidence does not rise to the level of allowing punitive damages as we found in the somewhat similar case of *Missouri Pacific Railroad Company* v. *Arkansas Sheriff's Boys' Ranch*, 280 Ark. 53, 655 S.W.2d 389 (1983). In the *Boys' Ranch* case there was evidence that corporate representatives had stated it was cheaper to settle a claim than to maintain the right-of-ways. Here the evidence most favorable to the appellee in this regard was the testimony of a former employee of Missouri Pacific Railroad that he had requested that the right-of-ways in this area be cleared of undergrowth. This same witness testified that usually when he made a request it was followed up, albeit slowly. He did not specifically request that the undergrowth at this particular intersection be cleared. There was no evidence that this was a hazardous crossing nor was there other evidence indicating the dangers had been presented to the railroad company. There is no direct evidence that the railroad company intentionally or wantonly disregarded any warnings relating to

the danger of this situation. Punitive damages are only justified when the defendant acts wantonly or with such conscious indifference to the consequences of his acts that malice may be inferred. *National By-Products, Inc.* v. *Searcy House Moving Company*, 292 Ark. 491, 731 S.W.2d 194 (1987). In *National By-Products*, we quoted from *Freeman* v. *Anderson*, 279 Ark. 282, 651 S.W.2d 450 (1983), with approval, as follows:

> In other words, in order to superadd this element of damages by way of punishment, it must appear that the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences, from which malice may be inferred.

In *National By-Products* we stated there was proof of gross negligence but that gross negligence is not sufficient to justify punitive damages. We have further stated that negligence, however gross, will not justify an award for punitive damages. *Freeman* v. *Anderson*, supra. Therefore, it was prejudicial error on this point for the trial court to submit the issue of punitive damages to the jury.

## V. THE ARKANSAS VEGETATION STATUTE IS PREEMPTED BY FEDERAL LAW AND THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE STATUTE.

Several witnesses testified that the vegetation growth on the railroad right-of-way was considerable. Some witnesses stated it was sufficient to obscure the vision between the vehicle and a train until it was too late to avoid a collision. This testimony was broad enough to include the "road bed" as being part of the area where the growth had occurred. Also, it was obvious that the testimony covered right-of-way outside the road bed.

Ark. Code Ann. § 23-12-201 (1987) provides that railroads shall "maintain their right-of-way at or around any railroad crossing of a public road or highway free from grass, trees, bushes, shrubs, or other growing vegetation which may obstruct the view of pedestrians and vehicle operators using the public highways." The statute provides for clearance of such right-of-ways for a distance of a hundred yards in either direction

of a railroad crossing. The federal law on this point, which allegedly preempts the state law, is 49 CFR § 213.37 (1986). It reads as follows: "Vegetation on railroad property which is on or immediately adjacent to the road bed must be controlled so that it does not (a) become a fire hazard . . . (b) obstruct visibility of railroad signs and signals; (c) interfere with railroad employees performing normal track side duties; (d) prevent proper functioning of signals and communication lines; or (e) prevent railroad employees from visually inspecting moving equipment from their normal duty stations. ·

It is obvious on the face of the rules that the federal regulation is expressly for the purpose of preventing fire hazards to track-carrying structures and equipment and to prevent interference with employees' performance of their duties. On the other hand, the Arkansas statute clearly is intended to protect pedestrians and operators of vehicles.

The Federal Railroad Safety Act (FRSA) addressed the role of the state in regulating railway safety when it provided as follows:

> A state may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A state may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

It is argued that the federal rule earlier cited preempts the state statute because the supremacy clause of the United States Constitution, article 6, prohibits states from legislating in the area where a federal rule or statute exists. The supremacy clause invalidates a state law which interferes with a federal law if: (1) congress expressly preempts it, or (2) if the congressional scheme is so comprehensive that no room is left for state regulation, or (3) the state law stands as an obstacle to the accomplishment of congressional objectives. *Hillsboroughs County, Florida* v. *Au-*

*tomated Medical Laboratory, Inc.*, 471 U.S. 707 (1985). We do not find the state law to have been preempted under any of these three tests. In fact, it is quite evident that the state and federal laws can be read without conflict. Therefore, Ark. Code Ann. § 23-12-201 (1987) has not been preempted by federal law.

## VI. THE TRIAL COURT ERRED IN ITS EVIDENTIARY RULING.

We note the various rulings on evidence presented because they may be relevant on retrial. The basic rule is that the admittance into the record of testimony or other evidence is a discretionary matter with the trial court. We have previously mentioned the introduction of the model as being within the discretion of the court. It may be that no objections will be raised at the second trial or objections which were not raised before may be raised. There may be additional information added or the model may be otherwise updated. We cannot anticipate the manner of presentation at the next trial.

Jim Corgil, a former employee of Missouri Pacific Railroad Company, testified that other employees had told him that they had requested the railroad to do something about the condition of the growth on the right-of-way. Proper objection was made on the basis of hearsay. The appellee argues that they were not offered to prove the truth of the matter stated, an exception to A.R.E. Rule 801, but rather to show that conditions of the right-of-way had been brought to the attention of the railroad officials. Such testimony was obviously an attempt to prove the truth of the matter asserted. Under the conditions as they existed at the time of the trial, it was error for the court to allow this hearsay testimony.

During cross-examination of the appellee, counsel for appellant requested permission to read two pages from the plaintiff's discovery deposition. The court sustained the plaintiff's objection. We agree with the appellant that ARCP Rule 32(2) provides that the deposition of a party may be used by the adverse party for any purpose at the trial. However, we cannot discern any prejudice on the record as it stands. This again is a matter which will not likely duplicate itself on retrial.

## VII. UNION PACIFIC RAILROAD COMPANY SHOULD HAVE BEEN DISMISSED AS A DEFENDANT.

 Appellant is correct on the matter of dismissing the action against Union Pacific Railroad Company. The answers to interrogatories clearly reveal that Union Pacific Railroad Company and Missouri Pacific Railroad Company are sister corporations owned by the Union Pacific Corporation. There was no evidence at all in the record to indicate that Union Pacific Railroad Company was in any way involved in this occurrence. It was a Missouri Pacific railroad and the train was owned by Missouri Pacific. The operators of the train were employees of Missouri Pacific. No nexus having been shown connecting Union Pacific Railroad to the matters involved, we agree that it should not have been a party to this action. Therefore, the judgment as to the Union Pacific Railroad Company is reversed.

Reversed and remanded with directions to proceed in a manner not inconsistent with this opinion.

HOLT, C.J., and GLAZE, J., concur in part and dissent in part.

HAYS, J., dissents.

TOM GLAZE, Justice, concurring in part; dissenting in part. While I agree with the result reached by the majority, I dissent on its finding that the trial court erred in submitting the issue of punitive damages to the jury. After reviewing the evidence in this case, I believe that there was sufficient evidence to submit this issue to the jury. There is evidence that the railroad breached its duty to keep the right of ways in the area of the accident clear of vegetation, and the railroad was apprised of this problem in safety meetings. While there is testimony that the railroad responded to specific requests to clear vegetation in a certain area, there remains a fact question for the jury as to whether the railroad was guilty of conscious disregard for the clearing of this right of way. *See HCA Health Servs. of Midwest, Inc.* v. *National Bank of Commerce*, 294 Ark. 525, 533, 745 S.W.2d 120, 125 (1988).

I concur with the majority's finding that the trial court erred in submitting the whistle and bell issue to the jury. However, contrary to the majority's recitation, there was testimony to indicate that train did not sound its whistle the mandated one-

quarter of a mile before the train reached the crossing. As this court pointed out in *Missouri Pac. R.R.* v. *Biddle*, 293 Ark. 148-A, 737 S.W.2d 625 (1987), the statute mandates that a train blow its whistle *or* bell one-quarter of a mile before the train reaches the crossing. While there was testimony to show that a fact question existed as to whether the train blew its whistle at the appropriate time, there was no testimony to show that the train failed to sound its bell. Therefore, the trial court erred in instructing the jury on this point.

STEELE HAYS, Justice, dissenting. The majority is reversing on two points: one, whether the trial court should have instructed the jury according to AMI 1801 on the duty of a railroad to sound a bell or a whistle in advance of public crossings and, two, whether the trial court should have submitted the issue of punitive damages to the jury. I respectfully disagree with the majority on those issues, though I am in agreement on the remaining points.

The basis for punitive damages, while marginal, was, I believe, sufficient. There was proof that the railroad breached its duty to keep its right-of-way cleared of vegetation so that vision would be unimpaired, and that the problem had been called to the attention of the appropriate railroad personnel. The condition of vegetation along the Van Buren to Paris route was described as "dangerous" by a former railroad employee and there was evidence that this condition was reported to the appropriate officials. The railroad admits it was guilty of gross negligence in this respect. When that proof is given its strongest probative force on review [*Dawson* v. *Fulton*, 294 Ark. 624, 745 S.W.2d 617 (1988)] then it follows that the jury could properly find as a fact that the railroad was guilty of a conscious disregard for the safety of the traveling public. *National By-Products, Inc.* v. *Searcy Housemoving Co., Inc.*, 292 Ark. 491, 731 S.W.2d 194 (1987); *Ellis* v. *Ferguson*, 238 Ark. 776, 385 S.W.2d 154 (1964).

Turning to the question of the bell, I am convinced that was not a material issue in the trial and I believe it is a mistake to reverse on that basis. Admittedly, the engineer, Larry Paul Cole, testified at one point that he "turned on the bell" about 1400 or 1500 feet before the highway crossing and left it on until he "got by" the crossing. I do not concede, as the majority opinion asserts, that such testimony must be treated as uncontradicted. The jury

was not required to believe that testimony and by so holding, the majority disregards much of the evidence from which the jury could fairly infer that no bell was rung. I think the case can be distinguished from *Missouri Pacific Railroad Co.* v. *Biddle*, 293 Ark. 148A, 737 S.W.2d 625 (1987), on that basis.

For almost a century this court has recognized the rule that where a witness to a particular fact may have an interest or a bias with respect to the litigation, his or her testimony, even if uncontradicted, is not binding on the jury. In *Skillern* v. *Baker*, 82 Ark. 86, 100 S.W. 764 (1907), we said:

> It may be said to be the general rule that where an unimpeached witness testifies distinctly and positively to a fact and is not contradicted, and there is no circumstance shown from which an inference against the fact testified to by the witness can be drawn, the fact may be taken as established, and a verdict directed based as on such evidence. But *this rule is subject to many exceptions, and where the witness is interested in the result of the suit, or facts are shown that might bias his testimony or from which an inference may be drawn unfavorable to his testimony or against the fact testified to by him, then the case should go to the jury.* (My emphasis. Citations omitted).

Over the years the rule has been followed repeatedly: *Gilbert* v. *Diversified Graphics*, 286 Ark. 261, 691 S.W.2d 162 (1985); *Bittle* v. *Smith*, 254 Ark. 123, 591 S.W.2d 815 (1973); *Zero Wholesale Gas Co., Inc.* v. *Stroud*, 264 Ark. 27, 571 S.W.2d 741 (1978); *Bullock* v. *Miner*, 225 Ark. 897, 286 S.W.2d 328 (1956).

The rule is most frequently applied to parties, but where the witness is shown to have a bias, or circumstances are present which permit an inference against the fact asserted, then the issue should be decided by the jury. *Skillern* v. *Baker, supra*. In suits against the railroad where the actions of the engineer are at issue it is obvious that he or she is a partisan witness and plainly interested in the result. In a very real sense it is the actions or inactions of the engineer that are on trial. Certainly that is true in this case.

Furthermore, when the testimony in its entirety is examined,

it is clear the trial court did not err in submitting the issue to the jury pursuant to AMI 1801, as the jury could have inferred that neither a bell nor a whistle was sounded for the required distance. Mr. Cole was called by the plaintiff (appellee) and was the first witness. He testified in some detail about his actions as he approached the crossing where the collision occurred. At no time during his examination in chief or cross-examination did he ever mention ringing a bell. Noting that the witnesses appear to use whistle and horn interchangeably, I quote from some of the abstracted portions of his testimony, with significant remarks italicized:

> I have seen rule books like the one you are showing me. I believe it says that an engineer approaching a public crossing will give a 20 second horn signal. I don't really know if they have changed the rule. I do know *we are required to sound the horn for 20 seconds or a quarter of a mile. That is what I do. That is a rule I follow.*

> It is my understanding that the rules require the horn to be sounded for 20 seconds or a quarter of a mile, whichever is longer. The whistle board would indicate where the quarter of a mile starts. On the day the accident happened *I blew the whistle* for a quarter of a mile. A quarter of a mile is 1,320 feet. *I blew the whistle* for that distance or maybe even a little longer, but at least a quarter of a mile.

> The engine weighs about 262,000 pounds. Before we left Van Buren we made a brake test. I checked the horn, the sanders and the headlights on both ends of the unit to make sure that everything was working. I checked the horns with the long end forward. The horn was a loud horn. All of the horns are loud. On this particular engine the horn was so loud it would make your head hurt. All of the locomotives have the horn situated just above the cab there. The horns are so loud that, when you get off work, you will normally have a slight ringing in your ears.

> There is no faster way to stop a train than by putting it into emergency. When you put the train into emergency you open up a large valve which dumps the air from the train line. The reservoirs that are placed on each car push the brake shoes against the wheels as tight as they will go.

Then you just sit and ride it out. *That's all you can do except blow the horn.*

As I approached the Highway 41 crossing we were going about 30 miles per hour. After we had gone over the highway 22 crossing I started around the curve and *I began sounding the whistle.* I was keeping an eye out ahead and to the left to see if anything was obscuring my movement, anything on the track or anything that was about to approach the track. *The whistle signal I gave as I approached the crossing was two long blasts, a short and then a prolonged blast.* When I saw the vehicle approaching the crossing I began making rapid short blasts trying to get his attention. That was in the last two or three second interval right at the end.

I make the kind of signal that the rule book calls for as I approached the crossing. *I blew the whistle all the way from a point 1,500 back until I got to the crossing.* When I saw Mr. Mackey's truck I realized he was not going to stop.

I really couldn't tell whether I was able to slow the train any after I put it into emergency before the collision occurred. I couldn't say I felt that much difference. We went about 800 feet past the crossing before we were finally able to stop. I believe it was a good stop for this train. *Other than looking down the tracks, blowing the whistle, seeing Mr. Mackey and putting it into emergency, there was nothing else I could have done under the circumstances.*

I went out there and measured the distance back to where *I began blowing the horn.* We measured it with a wheel. The Highway 22 crossing is about 12 mile up the road. There is a whistle board in there some place when you are coming back that tells you to start blowing for the Branch (Highway 22) crossing. I did not exactly use that board to start blowing for this crossing. I just know that it is about halfway between those two crossings. I did not measure to the board, I measured to the point *where I was when I started blowing the whistle.* When I would have seen that board it would have been down in front of me. I am not sure how far but I was down there so much I knew where the crossing was. *When you started around the curve you*

*started blowing the whistle.*

Not until Mr. Cole had been examined in chief, cross-examined, re-examined and re-cross-examined, did he ever claim to have rung the bell, and even then the intimation is that he was referring to his usual "practice." Quoting from the record:

[DEFENSE COUNSEL]:

Q: Mr. Cole, do you turn on your bell before you got to the Highway 22 Crossing?

A. Yes, sir.

Q: How long did you leave it on after you turned it on at that point?

A: Okay, as a matter of practice, before reaching, when I know there's a number of crossings coming up, I turn the bell on and leave it on until I go over the last crossing, and I turned that on before reaching the Highway 22 Crossing, which would be about fourteen, fifteen hundred feet, something in that neighborhood, and I left it on until I got by the 41 Highway Crossing.[1]

Two disinterested witnesses to the accident testified. Both were standing near the crossing and neither of them mentioned a bell. Gerald Don Clayton was called by the plaintiff, Gary White by the defendant. Mr. Clayton was standing on the loading platform of a feed store immediately adjacent to the crossing. He saw the truck coming toward the crossing and "then I heard the train blow its whistle." He continued:

I saw the truck first. *I heard the horn of the train before I saw it.* I heard the train and looked up and saw it. It was coming right past the station where you could see it, just into view. There is a large tree there. It would be about 200 feet back to where the train was. The maximum the train could have been *when I first heard the horn* was 250 to 300 feet.

When I saw the vehicle coming down the road I still had

---

[1] Record, p. 488.

not heard *the sound of the horn* at that time. As soon as I heard the sound of the train I looked for it. You could tell that it was close when you heard the sound. *I could have heard the horn blowing if the horn had been blowing prior to that time. There was nothing that prevented me from hearing a train horn prior to the time I heard it.*

I did not have any trouble hearing the train. It was good and loud when I heard it. I am not testifying that the train did not blow its whistle prior to the time I heard it, I just wasn't paying any attention. It could have been blowing prior to the time I first heard it, but I didn't hear it.

*I said that the train did not start blowing its horn until it got to the diesel pump.* Mr. Thompson asked me how much further down the track he would have blown it. It could not have been further down than the station where we have the diesel pumps. It could not have been further than that. If he started blowing it at the diesel pumps I would have heard it, but he didn't blow it there. He blew it right up by that tree. The diesel pumps are further back toward the west than the big tree. *If the horn had been blowing at the diesel pumps I would have heard it for sure and I did not.*

Even the witness called by the railroad, Mr. White, made no mention of a bell. This witness, like Mr. Clayton, was standing outside near the diesel pumps, about 150 feet from the crossing.

I did not witness the collision. I saw the train and I saw Mr. Mackey's truck. *I heard the train whistle blow twice, two short toots and a long one. It was a thousand feet or so down the track when I first heard the whistle.*

*It was 15 or 20 seconds or so from the time I first heard the whistle until the collision occurred. I heard two short toots and a long. I heard it once.* I don't remember whether there were any pauses from the time when I first heard the whistle until the train occupied the crossing. *The whistle was good and loud.* I did not have any trouble hearing it.

Thus the issue clearly was not the ringing of a bell, but whether the engineer complied with the law by blowing a whistle for one quarter of a mile before reaching the crossing. I submit the trial court was entirely correct to instruct the jury as it did and for

the reasons stated I would affirm.