CLARK COUNTY LUMBER COMPANY *v.*
JUSTINE COLLINS AND ELEASE SWEARINGEN

5-5381                                      459 S. W. 2d 800

Opinion delivered November 16, 1970

*Teague, Bramhall, Davis & Plegge,* for appellant.

*W. H. Arnold and G. W. Lookadoo,* for appellees.

J. FRED JONES, Justice. This is an appeal by Clark County Lumber Company from a judgment of the Hot Spring County Circuit Court rendered on a jury verdict in favor of Justine Collins and Elease Swearingen the plaintiffs-appellees, in the amounts of $7,636 in favor of Collins and $15,604 in favor of Swearingen. The appellant company relies on the following point for reversal:

"The verdict of the jury in each case was excessive and therefore contrary to the law and contrary to the evidence."

The plaintiffs-appellees are sisters and on January 30, 1968, were passengers in the back seat of an automobile belonging to, and being driven by, their father, Carmie Morrison, on Highway 67 near Malvern, Arkansas. In preparation for turning left from the highway the Morrison automobile had stopped to permit oncoming traffic to pass, and while so stopped, the defendant-appellant's 1966 one-half ton truck ran into the rear of the Morrison automobile knocking it a distance of 81.6 feet and injuring the appellees, Collins and Swearingen.

The two separate complaints were consolidated for trial and the only question presented on this appeal is whether the verdicts were excessive. We, of course, must view the evidence in the light most favorable to the appellees and if there is any substantial evidence to sustain the jury verdicts, they will not be disturbed on appeal. *Alexander* v. *Botkins*, 231 Ark. 373, 329 S. W. 2d 530; *Fred's Dollar Store* v. *Adams*, 238 Ark. 468, 382 S. W. 2d 592.

Mrs. Collins testified that prior to the accident she was employed by Levi Oberman factory in Arkandelphia, but wasn't working at the time the accident occurred; that she has two children and was staying at home taking care of the children at the time of the accident. She testified that she returned to work on March 5, 1969,

and was unable to work for a period of 13 months. She says she was not able to work at the time she did return to work but was forced to do so from economic necessity. She testified that she and her sister were thrown against the back of the front seat of the automobile with such force that it broke the back of the seat; that she sustained injuries to her head, neck, hip, back and leg on the right side. She says that her face was bruised in the accident and she received a "knot" on her head. She says that she saw Dr. Eli Garry, her family physician, four or five times; that she still has pain in her neck day and night and has constant pain in her back and down her right leg. She testified that her shoulder and neck bother her and that she has dizzy spells. She testified that along in March of 1969, she started going to Dr. Luck and was still under the care and treatment of Dr. Luck at the time of the trial. She testified that she was still holding down her job due to economic necessity brought about by injuries to her husband, but that some days she is unable to work because of headaches and pain. She testified that she used a heat pad for about a year but got afraid of it and went back on medication. She says that she has paid out approximately $150 for drugs because of her injuries. She testified that she went to see Dr. Luck some 13 months after the injuries and did so because she was not getting any better. Mrs. Collins submitted into evidence medical bills from Dr. Luck totaling $57 for treatment up to January 5; from the Clark County Memorial Hospital for $50 for X-rays, and from Dr. Garry in the amount of $35.

Dr. Luck testified by deposition that he had seen Mrs. Collins a number of times following the collision, the last time being on January 5. He testified that on physical examination he found tenderness about the muscles of the neck but that Mrs. Collins did not have restriction of motion. He says that Mrs. Collins seems to be under tension and still complains of pain in her neck and now complains of dizziness more in the form of blackouts. He says that Mrs. Collins complains of the pain in her neck and right hip, which seems to be localized now in the trapezius muscles bilaterally, and in

the right sacroiliac joint. He testified that straight leg raising was negative which probably rules out sciatic nerve irritation, and that in the cervical spine there was no evidence of deficit or nerve involvement as distinguished from nervous anxiety. Dr. Luck testified that he was sure Mrs. Collins did sustain neck injuries and "in these injuries to the neck where the muscles and the supporting structures are injured, are notorious from individual to individual." Dr. Luck testified that it was his opinion that Mrs. Collins' symptoms were related to the anxiety which she herself relates to the accident, and that the anxiety brought on muscle tension. He testified if the muscles have been injured, she will continue to have symptoms until she gets some relaxation. He testified that Mrs. Collins' pain in the sacroiliac joint will be aggravated by heavy lifting and straining.

On cross-examination Dr. Luck testified that when he first examined Mrs. Collins she had very little, if any, limitation of motion in her neck area, and that the straight leg raising was negative. He testified that on subsequent examination, he found the motions to be within normal limits, but that he did not want to say the movements were not restricted at all. He did consider the limitations as a minimum. He testified that X-rays of the cervical and bony spine did not reveal any bony injuries. He testified that his subsequent findings concerning Mrs. Collins' complaint, were that the muscles about the neck were tense and tight, and that they still remained tense and tight. He testified that he prescribed cortisone for Mrs. Collins but she did not respond. Dr. Luck then testified as follows:

"Q. Doctor, do you relate most of her problems to her anxiety problem?

A. I think that her persistence of the symptoms is relating to anxiety primarily.

Q. In treating injuries such as this—

A. Well, let me add to that. These neck things are treacherous to deal with in making definite statements about it. It is very possible that the anxiety has nothing to do with the persistence of the neck symptoms and it may be an underlying injury that she sustained in the muscles and ligaments that give her persistence of pain, but I think, and my opinion is that the anxiety at least has a good deal to do with tension of the muscles and persistence of it over a prolonged course."

He testified that Mrs. Collins was still having right sacroiliac pain and that the area is tender to pressure. He testified that after two years the left side has cleared up and apparently does not bother Mrs. Collins, but that the right side does still bother her. Dr. Luck testified that Mrs. Collins' disability is limited to discomfort which may persist for an indefinite period and on an intermittent basis.

The other appellee, Elease Swearingen, testified that she was 21 years of age at the time of the accident, is married and has one child. She says that she vaguely remembers the trip from the scene of the accident to the hospital. She testified that she stayed in the hospital for 14 days under the care and treatment of Dr. Eli Garry. She testified that she experienced pain when she went into the hospital; that her head hit the top of the automobile, and that she had severe pain in her head and neck. She says that she was taken upstairs from the emergency room at the hospital and told not to raise her head for a week. She testified that she had pain in her entire left side but that most of her pain was in her neck, shoulder and back. She says that X-rays were made at the hospital and she was released to go home still under the care of Dr. Garry. She says that she remained under the treatment of Dr. Garry for five months or so after the accident. She testified that she took muscle relaxants and sauna treatments to her neck and back. She testified that she is still not physically able to do her house duties

such as mopping or ironing or things of that sort, and that for a month after she returned home from the hospital, she was unable to do anything. She says that she has taken medication for a period of two years and still takes medication. She testified that when she was released from the care of Dr. Garry, approximately in October, she was still having neck pains and that the neck pains would end up with a headache which would cause her to have to go to bed. She says that she went to see Dr. Luck in March of 1969. She testified that she still has neck pains and frequent headaches and is not able to do anything strenuous such as mopping and things of that sort. She says that she had two brothers killed in an automobile accident, and that that fact does not help her mental situation. She says that the fact she has a small child she feels she is unable to care for probably depresses her considerably.

On cross-examination Mrs. Swearingen testified that she believes Dr. Garry's bill was $120; that she was not satisfied with her recovery was the reason for her going to Dr. Luck, and that she is still taking pain pills she obtained from Drs. Luck and Garry.

Dr. Luck testified on deposition that he first saw Mrs. Swearingen on January 30, 1968, at which time she complained of pain in her neck running down into the shoulders, and that she had frequent occipital headaches; that she complained of catches in her low back when she attempted to lift or do any strenuous activity, and that complaints of pain in the back running down the back of both legs still continued a year later. He testified that Mrs. Swearingen had had some hypotension since the accident. Dr. Luck also testified that Mrs. Swearingen complained of urinary incontinence following the accident; that this condition has cleared up to some extent, but that she continues to have "stress incontinence." On this point, as to "stress incontinence," Dr. Luck testified as follows:

"Q. What does that mean?

A. That means when she would, say, cough or strain or something, she would lose a little urine.

Q. What does this relate to you, doctor?

A. Of course, that could be—Really, I did not relate that to the accident. I related that probably it could be related to the accident, possibly, but I related that, I think, more to a pelvic condition.

Q. All right. Then, you did make an examination?

A. Oh, yes, I examined her all over. Yes.

Q. What examination did you make and what did it reveal?

A. Well, I examined her in a complete physical examination. Now, I think in her past history it is interesting to note no serious illness. She stated she did not have back or neck pain before the accident, did not have urinary incontinence before the accident and wasn't particularly nervous before the accident, no dizziness. Then, she stated she had been somewhat depressed before the accident, but that this was much worse since the accident, cried a lot since the accident, which she did not do before. She probably was initially depressed. Here I made a note of the fact that she had lost two brothers in another accident sometime within the recent past, and then on examination her vital signs were all normal and the positive findings were, well, say, on the examination of her neck and spine we found the following: She had a nearly normal range of motion, extreme tenderness in the Trapezius muscle

bilaterally, fibrosis in the body of the left Trapezius. In other words, this is a hard firm area that I interpreted as healing of a tear in that muscle. Tenderness paraspinally in the neck in the lower dorsal and upper lumbar region, particularly on the left and her rhomboid muscle, which sits between the scapular or wing bones, was tender and at this time bilateral. Straight leg raising was negative. She had some tenderness in the lower abdomen and then she had some tenderness in her pelvis as well. She had some hypothesia which should be some slight lack of sensation, some loss of sensation, later aspect of the left thigh, and medial aspect of the left calf. Blood findings were normal, urine was clear.

Q. Dr. Luck, is this the type of findings that you normally would find where someone has received an injury such as she had received, that is, being struck from the rear?

A. Yes, I think so.

Q. Did you make X-rays at this examination?

A. No. But, we can go back and check on the X-rays that she had made and there was no evidence of damage to the bony structure which is about all that X-rays of this type reveal.

Q. All right. These X-rays would be the X-rays that were made at the hospital at the time of her injury?

A. Right. Yes, sir.

Q. Did you notice any straightening of the cervical curve?

A. On the X-rays? Yes. There was some.

Q. What would this indicate to you, doctor?

A. That the muscles were in spasm, the neck muscle.

Q. And, again, is this what you would normally expect to find with this type of injury?

A. Yes, I think so.

Q. Now, were the complaints that Mrs. Swearingen made to you and with the examination of the X-rays that were made, are they in harmony with each other? Is this what you would normally expect her complaints to be from the examination of the X-rays?

A. Yes. I think her complaints were consistent with the type of injury she had. Yes.

Q. And, after your examination and the history obtained from the patient, what was your diagnosis at that time?

A. Okay. We have cervical dorsal and lumbar sprain.

Q. Is this painful?

A. Oh, Yes, it is. And, tear of the Trapezius muscle on the left, mental anxiety and depression aggravated by the accident, possible low grade inflammatory diseases which is not related at all to the accident.

Q. All right. You say a muscle spasm is a painful thing to happen?

A. Oh, yes.

Q. How long do you normally expect an injury of this type with the muscle spasm to exist?

A. Well, most injuries to the neck of this type, you know, would be—be well in six months, I think. And, then, they might have some trouble on an intermittent basis after that for a while.

Q. Doctor, what significance, if any, would you place on the fact that the patient still has these complaints a year after the accident when you first saw her?

A. Well, I think again her anxiety, mental state, is giving her a persistence of this muscle spasm, which again is painful, and she reports pain of course. She doesn't call it muscle spasm.

Q. And, do you relate this to the accident?

A. I relate the anxiety to the accident.

Q. Yes.

A. Yes, this girl is extremely anxious and tense and I think is going to need to have psychiatric care.

Q. Now, you have examined her and you had occasion to treat her then after her first examination.

A. I treated her. Now, let me look it up and be sure. I think three times since the initial examination. I have seen her on three occasions.

Q. Dr. Luck, did you have occasion to see her today?

A. Yes, I did.

Q. And, did she still have complaints on this date?

A. Yes, she still has complaints of being extremely nervous, which again, she relates back to the accident and states that she has developed this uterine spotting, or bleeding, which is a small amount of bleeding when she gets extremely nervous; whether this is related or not no one could say. She has frequent occipital headaches about twice a week, shooting pains in the region of the left rhomboid muscle and she has quite a fear of riding in an automobile as a passenger. She had the tenderness in her cervical muscles, Trapezius and rhomboid muscles when we examined her, but again, the most striking thing about her, I think, is the anxiety, which I think could well be related to the accident. There is no positive way that anyone can prove this.

Q. Dr. Luck, from your treatment, your examination and the history that you obtained from the patient and your examination of the X-rays and so forth, and based on your medical training, do you have an opinion as to the duration of her injury?

A. No. I don't have any idea how long it will be before she is asymptomatic, so to speak.

Q. Is it your opinion that this type injury could have an effect for several years hereafter or would you normally expect it to clear up?

A. Well, again, I think that the persistence of her symptoms is probably related to anxiety and tension, an extreme state of tension, which of course, throws these muscles into spasms, and they are going to—How long this healing is going to be delayed I don't know. I mean, I just wouldn't—I would have expected her to be well but she isn't."

On cross-examination Dr. Luck testified that Mrs.

Swearingen is still extremely nervous and to about the same extent as immediately following the accident; that she still has the spasm in her neck muscles; that he had to withdraw the drugs he had been giving Mrs. Swearingen for nervousness, because she was unable to tolerate them.

We have set out the evidence of record in some detail and from the evidence we are unable to say that the verdicts were excessive. In determining whether a jury verdict is excessive, the ultimate question is whether the verdict shocks the conscience of the court or demonstrates that the jurors were motivated by passion or prejudice. *Fred's Dollar Store.* v. *Adams,* 238 Ark. 468, 382 S. W. 2d 592.

This court has held that in determining whether the evidence is sufficient to sustain a verdict and judgment, we must not only view the evidence in the light most favorable to the appellee, and sustain the verdict if there is any substantial evidence to support it, but in determining whether there is sufficient evidence to sustain the verdict of a jury, we look at the evidence favorable to appellee alone. *Missouri Pacific Rr. Co.* v. *Hampton,* 195 Ark. 335, 112 S. W. 2d 428.

Every case involving the issue of an excessive verdict must be examined on its own facts; and before this court can constitutionally reduce a verdict we must give the evidence in favor of the verdict its highest probative force and then determine whether there is any substantial evidence to sustain the verdict. *Breitenberg* v. *Parker,* 237 Ark. 261, 372 S. W. 2d 828.

In the New Mexico case of *Hall* v. *Stiles,* 57 N. M. 281, 258 P. 2d 386, the court said:

"... the findings of the jury should not be disturbed as excessive, except in extreme cases, as where it results from passion, prejudice, partiality, sympathy, undue influence, or some corrupt cause or motive where palpable error is committed by the

jury, or where the jury has mistaken the measure of damages. However, the mere fact that a jury's award is possibly larger than the court would have given is not sufficient to disturb the verdict."

This court is considerably limited in determining whether a jury award is excessive. A jury and the trial court have an advantage over us in seeing and hearing the witnesses as they testify and their testimony is weighed. We are unable to rely on awards made in other cases in determining whether an award of damages in a given case is excessive because a comparison of awards made in other cases is a most unsatisfactory method of determining a proper award in a particular case, not only because the degree of injury is rarely the same, but also because the dollar no longer has its prior value.

The judgments are affirmed.