VIKING INSURANCE COMPANY of Wisconsin *v.*
Ramona JESTER

91-253                                          836 S.W.2d 371

Supreme Court of Arkansas
Opinion delivered July 20, 1992

319

*Laser, Sharp, Mayes, Wilson, Bufford & Watts, P.A.*, and *Griffin, Rainwater & Draper, P.A.*, for appellant.

*Mathis & Dejanes*, by: *Travis Mathis*, for appellee.

ROBERT H. DUDLEY, Justice. The plaintiff, Ramona Jester, sued her insurance company, Viking Insurance Company of Wisconsin, for the conversion of her car and the first party tort of bad faith in refusing to settle her claim for damages to her car. The defendant insurance company answered, but the trial court later struck the answer because the insurance company violated a court order requiring it to produce its entire claim file and because of a pattern of conduct designed to obstruct the discovery process. The trial court also entered a default judgment as to liability against the defendant. The case went to trial, and the jury returned a verdict of $1,000.00 compensatory damages and $250,000.00 punitive damages. The insurance company appeals. We affirm the judgment.

The facts, viewed in the light most favorable to the appellee-plaintiff, as we must do, are as follows. The plaintiff, a single parent with five children and ten grandchildren, some of whom live with her, lives on a dirt road in a remote area sixteen miles from Gurdon and works at the International Paper Company mill that is located one mile from Gurdon. She commutes the thirty-four miles each working day, and, when she was without a car, sometimes had to hitchhike to and from work. Her principal job is to cut logs as they come into the mill. She described her job as running a chainsaw, rolling logs with a cant hook, and using a shovel. The record fairly implies that she has a very limited education.

In September 1988, the plaintiff traded her older model Chevrolet Camaro for a newer 1984 model Chevrolet Camaro and paid the difference between her trade-in and the new Camaro with a loan from the First State Bank of Gurdon. She figures that the amount of the loan plus the value of her older car amounted to a purchase price of about $5,500.00 on her 1984 Camaro. The bank required her to have collision insurance on the car. She went to the bank's in-house agency, the First State Bank Insurance Agency, and purchased insurance. The agency placed the insur-

ance with the defendant insurance company and the defendant issued its policy which insured "damage to your car" less a $1,000.00 deductible. The premium for one year was $1,038.00 payable at a rate of $173.00 per month for the first six months of the policy. Plaintiff made the premium payments at all material times.

On August 2, 1989, the plaintiff was involved in a one-car accident in which her car was damaged beyond repair. The state trooper who investigated the accident caused her car to be towed to a nearby service station. The plaintiff promptly notified the insurance agent who relayed the information to the defendant, and one of the defendant's employees told the agent that the plaintiff must give a recorded statement about the details of the accident. Plaintiff went to the agency and, by telephone, gave a recorded statement to the defendant's claims representative in Austin, Texas. After the recorder was turned off, the claims representative, Ms. Cantu, asked the plaintiff whether she wanted to keep the salvage. Plaintiff, who had no experience in settling claims, responded that she did not want the salvage if the defendant paid her a just amount for the car. The plaintiff, who still owed the bank $2,150.00 on the car loan, asked a bank employee what her car was worth at the time of the accident. The employee replied that it had a value of $3,800.00, so the plaintiff guessed that, even with the deductible, she would receive a settlement of a few hundred dollars more than the outstanding loan amount, which was enough for a down payment on another car.

A few days later the claims representative, Ms. Cantu, called the plaintiff at the mill where she worked. There are 450 employees at the mill, and when a call comes for an employee who works out in the mill, it is necessary to relay the call to a foreman. The foreman then goes out to the employee and informs him or her of the call, and the employee then goes into the area where the telephones are located. Understandably, the company has a strict policy against employees receiving non-emergency calls at the mill. The plaintiff returned the call after she got off work and, after explaining the company's policy, asked Ms. Cantu not to call her again at work. Plaintiff explained to Ms. Cantu that she had critically ill family members, and when she received calls at work it scared her. Ms. Cantu responded, "Oh, well, that just

sounds like a personal problem to me," and she offered to pay only the amount of the car loan to the bank plus $50.00 to the plaintiff. The plaintiff declined the offer. Ms. Cantu mailed to the plaintiff something she said explained her appraisal, but the plaintiff said it looked like "a bunch of [newspaper] clippings" to me.

A week later Ms. Cantu again called the plaintiff at the mill. The call angered plaintiff's foreman. After work, the plaintiff returned the call. Ms. Cantu said that it was time to settle the claim and that the plaintiff needed to accept the $50.00. She asked the plaintiff why she was asking more than $50.00 and the plaintiff responded that a car dealer had told her that her car was worth between $3,800.00 and $4,200.00. Ms. Cantu replied that the car dealer said that "expecting you to jew [him] down." Ms. Cantu additionally told the plaintiff that she "did not know how big business is handled" and that she was "just a dumb broad from a hick town in Arkansas." The plaintiff again declined the offer.

In a later phone conversation, the plaintiff explained to Ms. Cantu that she could sell the parts from her car for more than $50.00, and so she would keep it rather than take the $50.00 for it. The plaintiff saw that her car was no longer at the service station and asked where it was. Ms. Cantu did not answer but instead transferred her to a man in the insurance company's salvage section who told her that her car was still at the service station. A few moments later, Ms. Cantu called the plaintiff and asked if she had gotten the salvage matter straightened out. The plaintiff said she had not, and Ms. Cantu told her that she was going to pay the amount of the car loan to the bank and pay $50.00 to her. Again, the plaintiff declined the offer. Ms. Cantu responded: "Well, hell, you're going to have to take what we offer anyway."

In their final conversation, Ms. Cantu told the plaintiff that she was going to pay the bank the amount of the loan and pay her $50.00, and if she did not accept the $50.00 right then, she would keep it and use the money to clean the car's dirty carpet, and if that happened the plaintiff would get nothing. The plaintiff then learned that the defendant had sold the salvage to a man named Randy Weeks who had already partially dismantled the car.

The plaintiff employed counsel and filed suit in which she alleged that the defendant insurance company was guilty of the

first party tort of bad faith in refusing to settle her claim and of converting her car to its own use. Subsequently, the trial court issued its order compelling discovery, and in it, directed the defendant to provide "[y]our entire claim file pertaining to Plaintiff's claim for damages, including but not limited to any and all documents relating to Plaintiff's claim for damages." The order also contained the following clear notice:

> Failure to comply with this Order shall result in the imposition of sanctions against the Defendant in conformity with the Arkansas Rules of Civil Procedure and shall include the award of attorney's fees to the Plaintiff's attorney.

Obviously, a central issue in the conversion count of the suit was whether the defendant insurance company was authorized to dispose of the wrecked car. The defendant's files were critical to discovering the truth about the matter. The plaintiff's attorneys suspected that Ms. Cantu had told the salvage department to dispose of the car before Ms. Cantu talked with the plaintiff, and that was a part of an oppressive strategy to force the plaintiff to accept the offer. The defendant originally maintained a master file of the claim along with a salvage subfile. At some time before the order compelling discovery, these two files were merged into one, but the defendant did not provide the plaintiff's attorneys with the salvage section of the file prior to discovery. The day before the claims representative was to give her deposition, the trial attorney for the insurance company learned of his client's failure to supply the salvage part of the file, but said nothing about it to plaintiff's counsel. This part of the file contained most of the pertinent information concerning the conversion of plaintiff's car. Also missing from the file was an underwriting risk notice and a request for evaluation form. The evaluation form was material to whether the defendant acted in bad faith in evaluating its offer of settlement. Plaintiff's counsel's pointed and persistent questions during the deposition of the claims representative brought out the fact that the salvage part of the file was missing. The defendant supplied the salvage subfile at that time, but did not provide the underwriting risk notice or the evaluation request form.

At the same deposition, the plaintiff's attorney tried to question Ms. Cantu about the sequence of the events surrounding

the conversion of the car. Ms. Cantu stated that she made entries out of sequence in the activity report. The plaintiff's attorney asked to see the original activity report in order to examine the different colors of ink used in making the entries on different days since that might reflect the sequence of making entries. The defense attorney refused the request because "the deposition had already taken too long" and there were "handwritten notes on the report" which plaintiff's counsel were not entitled to see. In sum, even at the deposition session, the plaintiff's attorney was not allowed to inspect the original of the activity report that contained the entries made in different colors of ink on different days, which might have shown the true sequence of events pertinent to the claim of conversion. The deposition of another of defendant's employees, David Boyd, was taken at the same time, and while plaintiff's counsel was again trying to determine the sequence of events, it became apparent that the defendant's telephone records might disclose the sequence in which the events took place. At that time defendant's counsel agreed to provide those records, but in fact, they were withheld until the court later ordered them produced. When they were finally produced, they showed that some of the calls the defendant's employees claimed to have made, in fact, were never made.

Plaintiff's counsel moved for sanctions against defendant. The trial court ordered counsel to appear for a hearing on the matter, and after hearing evidence and arguments from both counsel, entered an order which provided in part:

> The Defendant adduced no evidence on the foregoing matters and the Court found defense counsel's arguments to be unpersuasive. From the evidence adduced by the Plaintiff the Court further finds as follows:
>
> A.  The Defendant violated the Order of this Court by its failure to provide its salvage subfile, the underwriting risk notice and the request for evaluation form to the Plaintiff by January 8, 1991;
>
> B.  The Plaintiff adduced sufficient evidence to show a pattern on the part of the Defendant to obstruct the discovery process;
>
> C.  The Defendant has failed to provide the Plaintiff

with the telephone records, the underwriting risk notice and the request for evaluation form, all of which she requested at the depositions in Austin and later in Requests to Produce, and that the time for producing such documents has expired;

D. The Plaintiff was entitled to review the original records she requested at the depositions in Austin, at the time of the deposition, and the failure to allow her such inspection deprived her of the opportunity to question the witnesses concerning the original entries in those records;

E. Failure of the Defendant to provide the Plaintiff with all of its claim file prior to the time of the depositions deprived her of the opportunity to properly prepare for those depositions; . . . .

■ Appellant's first assignment of error is that the trial court erred in entering the sanctions of striking the answer, declaring a default as to liability, and awarding fees and costs. The defendant divides the argument into three subparts. In the first subpart, it argues that the trial court abused its discretion in granting the sanctions since the defendant only refused to allow the plaintiff to inspect an original document at a deposition. The argument is without merit. As can be seen from the trial court's order, the sanctions were imposed only after the trial court considered all of the circumstances surrounding the defendant's refusal to obey the court order to produce its "entire claim file."

■ The defendant insurance company additionally argues that it produced a copy of the activity report, and that is all that was required under the order, since the order did not require it to produce the original of the report. The argument is specious. It is true that the trial court's order only provided for the "entire" claim file, not the "original," but the word "entire" means "with no element or part missing." *Webster's Third New International Dictionary* 758 (1961). Without the different colored pen markings made on different days, the claim file produced was not delivered entirely.

■ Under this first subpart, the appellant also argues that A.R.C.P. Rule 37 does not authorize sanctions for refusing to allow inspection of an original document during depositions. The

argument misses the mark because the trial court ordered the defendant to produce its "entire claim file," and it did not do so. A.R.C.P. Rule 37(b) provides for sanctions for "Failure to Comply with Order."

■ In the second subpart of the first assignment of error, the defendant-appellant argues that the trial court abused its discretion in imposing the harshest of the sanctions when there was no showing of a willful and deliberate violation of the trial court's order. The short answer to the argument is that we have held that our rules of civil procedure do not require a finding of willful or deliberate disregard of the order before sanctions may be imposed. *Cook* v. *Wills*, 305 Ark. 442, 808 S.W.2d 758 (1991); *Cagle* v. *Fennel*, 297 Ark. 353, 761 S.W.2d 926 (1988).

■ We have said that the imposition of sanctions for the failure to make discovery rests in the trial court's discretion, *Goodwin* v. *Harrison*, 300 Ark. 474, 780 S.W.2d 518 (1989), and "[w]e have [repeatedly] upheld the trial courts' exercise of discretion in granting severe Rule 37 sanctions for flagrant discovery violations." *Rogers* v. *McRaven's Cherry Pickers, Inc.*, 302 Ark. 140, 145, 788 S.W.2d 227, 230 (1990). Indeed, this court has upheld the trial court's imposition of the most severe sanctions in several cases in which a party has failed to timely respond to a discovery request within the time provided in a trial court's order for it to do so and when the order contained notice of the possible imposition of sanctions for failure to comply. *Cagle* v. *Fennel*, 297 Ark. 353, 761 S.W.2d 926 (1988); *Harper* v. *Wheatley Implement Co., Inc.*, 278 Ark. 27, 643 S.W.2d 537 (1982); *Burton* v. *Sparler*, 272 Ark. 254, 613 S.W.2d 394 (1981); *Mann* v. *Ray Lee Supply*, 259 Ark. 565, 535 S.W.2d 65 (1976).

In the present case, the trial court imposed the most severe sanctions for defendant's failure to comply with its order to provide plaintiff with its entire claim file. The trial court's order was issued on November 21, 1990. Pursuant to its motion for an extension of time to respond, the defendant had until January 8, 1991, to provide the material. On January 3, 1991, defendant sent plaintiff what it purported to be its entire claim file. However, almost three months later, during the taking of the depositions of the two employees responsible for the claim file, plaintiff's attorney discovered that the material provided did not contain the

subfile which showed how the salvage of plaintiff's car was handled. Also missing from the claim file were the underwriting risk notice and the request for evaluation form.

█ Defendant provided the salvage subfile at the deposition, but did not provide the other two documents at that time. Trial defense counsel, who is not the same as appellate defense counsel, learned of the existence of the subfile the day before the depositions but did not inform the plaintiff of its existence before the depositions. No explanation was given in the deposition for the failure to provide this subfile. In the hearing on the motion for sanctions, defendant's counsel stated only that the subfile was not produced due to an oversight. The salvage subfile had been crated by appellant's salvage handler, Ms. Williams, after the claims representative, Ms. Cantu, had determined by the report of an adjuster that appellee's car was damaged beyond repair. Ms. Cantu also kept a file on her part of the work on the claim. Ms. Cantu's and Ms. Williams' files were merged on September 26, 1989, when Ms. Cantu allegedly thought that she had reached a settlement and sent her file to Ms. Williams. Ms. Williams eventually sent the file back to Ms. Cantu after she learned that a settlement had not been reached. Both knew of the existence of the salvage subfile and that it contained highly relevant information but did not provide it until nearly three months after the time prescribed by the court. Thus, under our precedent, the trial court did not abuse its discretion. Defendant's employees violated the court's order without explanation by not complying within the prescribed time. Such action is sufficient to warrant sanctions. *Cagle* v. *Fennel*, 297 Ark. 353, 761 S.W.2d 926 (1988); *Harper* v. *Wheatley Implement Co., Inc.*, 278 Ark. 27, 643 S.W.2d 537 (1982); *Mann* v. *Ray Lee Supply*, 259 Ark. 565, 535 S.W.2d 65 (1976); *Graham* v. *Sledge*, 28 Ark. App. 121, 771 S.W.2d 296 (1989).

█ At the time of the hearing on plaintiff's motion for sanctions, the defendant still had not provided the underwriting risk notice and evaluation request form. Defense counsel said that he had not been able to locate these documents but promised he would provide them. In a pretrial hearing the day before trial, defense counsel stated that he had discovered the evaluation form never existed, because the claims representative had made the request for evaluation by telephone. In this respect the present

case is similar to *Cook v. Wills*, 305 Ark. 442, 808 S.W.2d 758 (1991). There, we affirmed the trial court's imposition of severe sanctions for the appellant's failure to produce a requested tax return by the time of trial, at which time she said she could not find the form. The trial court had not issued a discovery order because the appellant had repeatedly promised that she would produce the form. We noted that there were at least three pretrial hearings at which the appellant could have apprised the trial court of her difficulty in producing the tax return. Likewise, the defendant in this case had at least two opportunities prior to trial to inform the court that the evaluation request form did not exist. Accordingly, we hold that the trial court did not abuse its discretion in imposing the sanctions.

Defendant's third subpoint for reversal under the first assignment of error is that the trial court abused its discretion in entering a default judgment absent an affirmative showing of prejudice to the plaintiff as required by A.R.C.P. Rule 55(a). This argument has no merit as Rule 55(a) is applicable to default judgments entered due to the failure of a defending party to appear or respond to a claim. It does not apply to default judgments as to liability entered as a sanction pursuant to Rule 37. *See Sphere Drake Ins. Co. v. Bank of Wilson*, 307 Ark. 122, 817 S.W.2d 870 (1991).

The defendant insurance company's second assignment of error contains two subparts. The first is that the trial court erred in giving an instruction to the jury on the issue of punitive damages because there was not sufficient evidence to warrant such an instruction. In *Aetna Casualty & Surety v. Broadway Arms*, 281 Ark. 128, 133-34, 664 S.W.2d 463, 465-66 (1983), we set out the elements of the first party tort of bad faith for the refusal to settle a claim. There, we acknowledged that unfair and oppressive pressure to settle may constitute the first party tort of bad faith. Here, there was evidence indicating the claims representative dealt dishonestly with the plaintiff in the appraisal of the value of her car, and at the same time, was oppressive in calling her at the mill, abusive in her language, and coercive in dealing with her insured. In addition, there was evidence implying that the defendant converted the wrecked car in order to place the plaintiff under pressure to settle. Indeed, for the trial court to have refused to instruct on the tort of bad faith

would have been error, for a jury should be instructed on all theories of recovery which the evidence warrants. *Daniel* v. *Quick*, 270 Ark. 528, 606 S.W.2d 81 (1980).

The plaintiff's second subpoint with regard to the instruction is that it violates the defendant insurance company's right of due process. Before addressing the substantive law of the subpoint, we address the procedural law and our limited review of this case under the circumstances before us.

Objections to instructions to the jury are covered by A.R.C.P. Rule 51. It provides, in material part:

> No party may assign as error the giving or the failure to give an instruction unless he objects thereto before or at the time the instruction is given, stating distinctly the matter to which he objects and the grounds of his objection, and no party may assign as error the failure to instruct on any issue unless such party has submitted a proposed instruction on that issue.

In accordance with the rule, we have said that in order to preserve an objection regarding an erroneous instruction of the law, the party appealing must make a timely objection by telling the trial judge why the instruction was wrong, and when the point of appeal is that the court failed to give an instruction, the party appealing must submit a proposed instruction on the issue. *Peoples Bank and Trust Co.* v. *Wallace*, 290 Ark. 589, 721 S.W.2d 659 (1986).

At trial, the defendant asked the court to give its proposed instruction No. 1 in light of the Supreme Court's ruling in *Pacific Mutual Life Ins. Co.* v. *Haslip*, 111 S. Ct. 1032 (1991). The trial court refused to give defendant's proffered instruction No. 1. Whether the trial court erred in refusing to give the defendant's proffered instruction is the only issue before us. We set this out because the defendant seeks to modify its argument and, for the first time on appeal, argues that the state procedure for awarding punitive damages violates due process. As we have said many times, we do not consider arguments on appeal that were not raised in the trial court. Stated another way, the general rule is that a trial court will not be reversed unless it committed some prejudicial error, and if an issue was never presented to the

trial court, it could not have committed error on that issue.

■ In *Pacific Mutual Life Ins. Co.* v. *Haslip*, the Supreme Court established three criteria to judge whether a particular award violated the Due Process Clause. Those criteria are: (1) Whether the jurors were given sufficient guidance and instruction on punitive damages so that they could reach a rational decision. (This criterion deals with instructions.) (2) Whether there were sufficiently established post-trial procedures and standards in the trial court for scrutinizing punitive damage awards. (This criterion does not deal with instructions.) (3) Whether there are sufficiently established standards for appellant review. (This criterion does not deal with instructions.)

For the reasons set out, we do not consider any of the defendant insurance company's arguments under (2) and (3) above. We do consider that part of (1) above relating the trial court's failure to give defendant's proffered instructing No. 1.

The defendant's proffered instruction No. 1 was submitted to the trial court exactly as follows:

Defendant's Proposed

Instruction No. 1

In addition to compensatory damages for any actual loss that Ramona Jester may have sustained, she asks for punitive damages from Viking Insurance Company of Wisconsin. Punitive damages may be imposed to punish a wrongdoer and to deter others from similar conduct. In order to recover punitive damages from Viking Insurance Company of Wisconsin, Ramona Jester has the burden of proving:

That Viking Insurance Company of Wisconsin engaged in affirmative misconduct which was dishonest, malicious, or oppressive in an attempt to avoid its liability under the insurance policy issued to Ramona Jester. Actual malice is that state of mind in which a person's conduct is characterized by hatred, ill will, or a spirit of revenge. Malice may be inferred from conduct and surrounding circumstances.

You are not required to assess punitive damages

against Viking Insurance Company of Wisconsin but you may do so if justified by the evidence.

If you find that punitive damages are justified by the [The proffered instruction ends in mid-sentence.]

Instead, the trial court gave the following instruction on punitive damages rather than defendant's proposed No. 1.

In addition to compensation for any actual loss that Ramona Jester may have sustained, she asks for punitive damages from Viking Insurance Company of Wisconsin. Punitive damages *may* by imposed to punish a wrongdoer and to deter others from similar conduct. In order to recover punitive damages from Viking Insurance Company, Ramona Jester has the burden of proving that Viking Insurance Company of Wisconsin engaged in affirmative misconduct which was dishonest, malicious, or oppressive in an attempt to avoid its liability under the insurance policy issued to Ramona Jester. Actual malice is that state of mind in which a person's conduct is characterized by hatred, ill will, or a spirit of revenge, actual malice need not be proved but may be inferred from conduct and surrounding circumstances.

In arriving at the amount of punitive damages, you may consider the financial condition of Viking Insurance Company as shown by evidence.

As can be immediately seen, the only distinction between the instruction that was given and the defendant's proposed instruction is that the instruction given told the jurors they "may" impose punitive damages while the proposed instruction told them that they were not required to assess punitive damages but "may" do so. However, the trial court also gave the pattern A.M.I. instruction on the burden of proof and preponderance of the evidence, and in another discussed punitive damages "if appropriate." This slight difference between the instruction given and the proffered one did not violate the defendant's right to due process, and this is especially so in light of the fact that the trial court had already granted a default as to "liability for actual and *punitive*" claims. Both the instruction given and the proposed instruction use the same language in explaining the nature and

purpose of punitive damages, punishment and deterrence. Both identify the damages as punishment for civil wrongdoing, and both provide that it was within the discretion of the jury to award such damages. *See Haslip*, 111 S. Ct. at 1044-45. Under the *Haslip* examination, there is no material difference between the instruction given and the proposed instruction. Thus, the trial court did not err in refusing defendant's proffered instruction No. 1.

The defendant's final point of appeal is that the punitive damages are excessive and demonstrate that the jury was motivated by passion and prejudice. We have always carefully scrutinized punitive damage awards. *See Robertson Oil Co., Inc. v. Phillips Petroleum Co.*, 779 F. Supp. 994 (W.D. Ark. 1991). We have written, "[P]unitive damages constitute a penalty and must be sufficient not only to deter similar conduct on the part of the same tortfeasor, but also to deter any others who might engage in similar conduct." *Maxwell* v. *Walser*, 296 Ark. 70, 73, 751 S.W.2d 351, 353 (1988). That statement is particularly appropriate in this case. Each case must be reviewed on its own facts, *Clark County Lumber Co.* v. *Collins*, 249 Ark. 465, 459 S.W.2d 800 (1970), and the financial condition of the defendant is a proper matter to consider. *Holmes* v. *Hollingsworth*, 234 Ark. 347, 352 S.W.2d 96 (1961). The amount of actual damages is but one criterion for the assessment of punitive damages. *Matthews* v. *Rodgers*, 279 Ark. 328, 651 S.W.2d 453 (1983).

The oppressive actions of the defendant that should be deterred are adequately set out in the beginning of this opinion and need not be repeated. In addition to those facts, the defendant's financial report shows that in 1989 it had assets of $165,306,703.00, premium income of $146,992,431.00, net income of $9,132,487.00, and a net worth of $49,562,012.00. The damages awarded are not excessive in view of this State's interest in punishing the conduct of this defendant and deterring others from engaging in such conduct.

Affirmed.

HAYS, J. dissenting.

GLAZE, J., not participating.

STEELE HAYS, Justice, dissenting. The offending conduct in

this case, failure to timely deliver a subfile pursuant to discovery, may well have been inadvertent, or, at worst, neglectful. As best I can determine, it was not onerous to appellee and did not impede the progress of the trial. Yet the trial court struck the pleadings of the appellant, leaving it defenseless and vulnerable to claims for compensatory and punitive damages. Before the harshest sanction possible under the law is imposed there ought to be a stronger showing of culpability than I can glean from this record. Because I regard the penalty as seriously disproportionate to the offense, I respectfully dissent.