PURINA MILLS, INC. and Jack Price *v.*
Jimmy R. ASKINS and Robin Askins

93-1050 875 S.W.2d 843

Supreme Court of Arkansas
Opinion delivered May 16, 1994

60

*The Rose Law Firm, A Professional Association*, for appellants.

*Wilson, Engstrom, Corum, Dudley & Coulter*, by: *Stephen Engstrom*, for appellees.

ROBERT H. DUDLEY, Justice. Robin and Jimmy Askins own and operate a small dairy farm near Subiaco. Before March 1990, the Askinses fed their cows small amounts of Tank Topper and Maxi Tech, two kinds of cattle feed manufactured by Purina Mills, Inc., but they principally fed a brand manufactured by another company. A Purina salesman told them that Purina products would work better in their computerized feeding system. He gave them a booklet entitled *Purina Dairy Facts Booklet*, co-authored by various nutritionists and veterinarians, that discusses the importance of vitamins A and D and lists some of the symptoms of illnesses caused by deficiencies of these two vitamins. He told them that Tank Topper and Maxi Tech would meet all of the cows' nutritional needs. The tags on both Tank Topper and Maxi Tech stated that they contained a "guaranteed analysis" of "vitamin A not less than 5000 IU/lb," or 5000 international units per pound, and "vitamin D not less than . . . 1000 IU/lb." In March 1990, in reliance on the representations by the Purina salesman, the Askinses began feeding their cows Tank Topper and Maxi Tech feeds exclusively. The Askinses bought the feed from the Price Milling Company, which is owned by Jack Price.

After switching wholly to the Purina feeds, the Askinses noticed that the cows began to have problems. First, they saw a drop in milk production. Next, they saw that some of the cows were listless, some had dull or runny eyes, others had rough, dull coats and a bad general appearance, some lost their appetites, and some had diarrhea. Later, some showed evidence of reproductive problems such as spontaneous abortions, retained placentas, inability to conceive, and irregular heat periods. Six cows died and five had to be sold because of low productivity. The

Askinses sought to find the cause of the problems. In May 1990, they asked a Purina salesman to take a fecal sample and conduct a fecal worm egg count. The sample was taken, but the analysis showed that this was not the problem. The Askinses sent six blood samples to the Iowa Testing Laboratories, and four of the samples tested positive for bovine leukemia virus, but all were negative for leptospirosis, a parasitic infection. Milk tests for iodine content were negative. A blood sample from one of the dead cows revealed low zinc, copper, and cobalt contents, deficiencies which could cause anemia. On another cow, a test for brucellosis, a bacterial infection, was returned negative.

In June 1990, the Askinses called a representative of Purina and requested that the Purina feed be taken back. When a Purina employee came to their farm to pick up the remaining feed, both he and Jimmy Askins removed a sample of Maxi Tech and each placed his sample in a plastic bag. Jimmy Askins stored his sample in a freezer. The Askinses began using a different manufacturer's brand of feed that contained twice the vitamin A the Purina feed was purported to have. They soon saw an increase in milk production and, over a longer period of time, saw a decrease of the other symptoms. After consulting with a veterinarian, Jimmy Askins began to suspect the cows' illnesses had been caused by a vitamin A deficiency. In December 1990, he sent his sample, which had been stored in the freezer, to the Iowa Testing Laboratory. The laboratory tested for the content of vitamins A and D and found that the sample contained 2,611 IU/lb. of A and 802 IU/lb. of D. The test seemed to confirm his suspicion that vitamin A deficiency was the cause of the problems. He gave some of the cows vitamin A injections and immediately noticed a further improvement.

The Askinses subsequently filed this suit against the manufacturer of the feeds, Purina Mills, Inc., and the supplier of the feeds, Jack Price. Their complaint alleged that Purina and Price were liable under the alternative theories of strict liability and breach of express and implied warranty. Price filed a counterclaim against the Askinses for the amount they owed on an open account for feed and other merchandise. A jury awarded the Askinses $80,045 and awarded Price $3,837 on his counterclaim. Purina and Price appeal, contesting the judgment in favor of the Askinses, and Price appeals separately, alleging the verdict on his

counterclaim was inadequate. The Askinses do not cross-appeal. We reverse and remand on the appeal by Purina and Price. We affirm on Price's appeal of his counterclaim.

Purina and Price's assignment of error that requires us to reverse and remand is the assignment that the verdict was excessive. Over Purina and Price's objection, the trial court instructed the jurors that if they found for the Askinses on the issue of liability, they were to then fix the amount of damages, and that would include, among other things, "the difference in fair market value of dairy cattle, dead or culled, from the herd." Purina and Price had earlier objected to the instruction, arguing in part that there was no substantial evidence any cows had died or were culled because of a vitamin deficiency. The testimony on the issue was as follows. The Askinses testified that during the time the cattle showed the various symptoms, six mature cows died, five had to be culled from the herd, and the remaining cows were listless, had dull, rough coats, runny eyes, a poor general appearance, and produced noticeably less milk. They testified that the remaining cows demonstrated improvement after injections of vitamin A. Jimmy Askins testified about the market value of each of the dead or culled cows, the income lost from each, the value of aborted calves, and the losses for the increase in calving interval and, considering all of those factors, concluded that they had suffered $80,045 in damages.

■■ Next, the Askinses presented two expert witnesses, Dr. Glen Krumme, a doctor of veterinary medicine who specializes in cattle reproduction, and Dr. Wayne Kellogg, a professor of animal science who specializes in management and nutrition of dairy cattle. Dr. Krumme testified that it was highly probable that a vitamin A deficiency was the cause of the problems, and he agreed that the symptoms were consistent with those described in Purina's booklet *Dairy Cattle Feeding and Nutrition.* However, he also stated that he could not "testify one way or another that the dead cows died because of a vitamin A deficiency." Dr. Kellogg testified that the most common symptoms of vitamin A deficiency are reproductive problems and that it is rare for a cow to die from such a deficiency. He testified that there was no evidence that the six cows died from a vitamin A deficiency. The Askinses offered no other proof about the cause of the deaths of the six cows. This proof, given its highest probative value and

drawing all possible inferences in favor of appellees Askinses, fails to objectively link the vitamin A deficiency with the deaths of the six cows. The jury returned a general verdict that unquestionably included damages for the dead cows, the loss of milk from them, and the loss of reproduction from them. The verdict was accordingly excessive, and we must reverse. Since there was substantial evidence of other damages, we remand for another trial.

■ In arguing that the verdict was excessive, Purina and Price additionally contend that "there can be no recovery for future milk and calf production of a cow which has been disposed of, after a replacement of comparable capacity has been or could have been acquired." Essentially they are arguing that the jury should have been instructed to reduce damages for failure to mitigate, but they did not submit such a proposed instruction to the trial court. We will not consider such an argument for the first time on appeal. *Viking Ins. Co.* v. *Jester*, 310 Ark. 317, 836 S.W.2d 317 (1992).

■ Purina and Price also contend that we should dismiss this case because there was no substantial evidence that the feeds failed to contain the amount of vitamins represented and even if the feed did not contain those amounts, it was not the proximate cause of the cows' problems. We reject these arguments. The laboratory test showed vitamin deficiencies in the feed, and the test constituted substantial evidence of vitamin deficiencies. Purina's booklet describes symptoms of vitamin deficiencies, and the herd showed many of those symptoms. Drs. Krumme and Kellogg testified that a vitamin A deficiency could have caused any of the cows' problems except for the death of the mature cows. Thus, there was substantial evidence that the feeds were inadequate and caused injury to the cows. Purina and Price point out that their feed was fed exclusively for only three months, and that both their experts agreed, and common sense dictates, that the various illnesses could not be caused by a vitamin A deficiency over such a short period. They argue that cattle got along without vitamin supplements from Biblical times until thirty years ago, and, therefore, as a matter of common sense, a vitamin deficiency over a three-month period could not cause the illnesses. There was a valid dispute over the issue, and the Askinses presented substantial evidence that the illnesses were caused by the deficiency, so it was a matter for the jury. Similarly, it was for

the jury to determine whether the sample was sufficient to show that the feed was defective, whether it was adequately stored, and whether the test was performed in a timely manner.

 We now address those assignments which will likely arise again upon retrial. Purina and Price contend the proof was insufficient to justify submitting the case to the jury on both the warranty theories and strict liability. It is not error *per se* to submit a case to the jury on alternative theories of recovery. *DuPont DeNemours & Co.* v. *Dillaha*, 280 Ark. 477, 659 S.W.2d 759 (1983). Assuming the proof is the same upon remand as it was in the first trial, the trial court may again correctly give the same instructions on breach of warranties. At the first trial, the Askinses presented testimony that the cows became sick soon after eating the feed, and an analysis of the feed later showed it to be vitamin-deficient. The implied warranty of merchantability is breached when a product is not suited for its ordinary purpose. *See* Ark. Code Ann. § 4-2-314 (Repl. 1991). Feed that makes cows sick is not fit for its ordinary purpose, and the trial court correctly instructed on the issue of breach of warranty of merchantability. Purina and Price contend that there was no proof that Purina knew of any particular purpose for which the Askinses intended to use the feed. To the contrary, there was proof that the Purina salesman made specific recommendations for the Askinses' dairy operation. Purina and Price contend the Askinses were not entitled to the instruction on breach of express warranty because there was no proof that the feed was unfit at the time of the sale. Again to the contrary, there was testimony that the cattle were fed the food shortly after it was purchased, that they became ill shortly after eating it, and that the feed was later proven to be deficient. The proof, and its reasonable inferences, constituted substantial circumstantial evidence that the feed was deficient at the time of the sale. Again, assuming the proof is the same, all of the instructions on breach of warranties may again be correctly given.

 For the case to be correctly submitted to the jury on strict liability, the Askinses will have to offer proof that the feed was in a "defective condition which rendered it unreasonably dangerous" and that the "defective condition was a proximate cause of harm" to the cattle. Ark. Code Ann. §§ 4-86-102(a)(2) & (3) (Repl. 1991). The concept of strict liability is

not intended to apply to all products supplied in a defective condition, but rather is to apply to products which are both defective and unreasonably dangerous. *See Purvis* v. *Consolidated Energy Prods. Co.*, 674 F.2d 217 (4th Cir. 1981); *Two Rivers Co.* v. *Curtiss Breeding Serv.*, 624 F.2d 1242 (5th Cir. 1980); *Texsun Feed Yards, Inc.* v. *Ralston Purina Co.*, 447 F.2d 660 (5th Cir. 1971); *Hart Eng'g Co.* v. *FMC Corp.*, 593 F. Supp. 1471 (D.C. R.I. 1984); *Berkeley Pump Co.* v. *Reed-Johnson Land Co.*, 279 Ark. 384, 653 S.W.2d 128 (1983); *Brown* v. *Western Farmers Ass'n*, 521 P.2d 537 (Or. 1974); *Continental Ins.* v. *Page Eng'g Co.*, 783 P.2d 641 (Wy. 1989).

█ Our law is patterned after the Restatement (Second) of Torts § 402A, the comments to which define "unreasonably dangerous" as requiring something *beyond* that contemplated by the ordinary and reasonable buyer, taking into account any special knowledge of the buyer concerning the characteristics, propensities, risks, dangers, and proper and improper uses of the product. The possibility that manufactured feed for livestock might not contain the nutritional constituents recited on its labels, or that such levels might be affected by time, weather, or methods of storage, would hardly be beyond the contemplation of the ordinary buyer. *See Berkeley Pump Co.*, 279 Ark. at 394, 653 S.W.2d at 133.

█ We recognize the Askinses may have stronger proof on this issue upon remand. If the proof on retrial shows that the feed was simply supplied in a defective condition, the instruction should not be given. However, if the proof shows that the feed was defective and unreasonably dangerous, for example, that it was toxic, the instruction should be given.

█ Price separately argues that the amount awarded on his counterclaim was insufficient. He testified that the Askinses owed $9,918.89 for the Tank Topper and Maxi Tech feeds and other supplies. The price of the other supplies amounted to $3,837.02, the exact amount that the jury awarded Price on his counterclaim. The jurors were instructed that Price was entitled to recover the full sale price of the feed and the other supplies, unless the jury found that the feed had "less than full value at the time of sale by reason of a deficiency of vitamins A or D," in which case Price would get "only the fair market value of the feed actually delivered." The jury apparently determined that the

Tank Topper and Maxi Tech were worthless, and such a finding, under the instructions given, was within the jury's province.

Affirmed in part and reversed and remanded in part.

BROWN, J., dissents.

ROBERT L. BROWN, Justice, dissenting. The majority holds that there was substantial evidence that the Purina feed caused serious illness in the Askins herd of dairy cows but that there was no evidence of a causal link between the deficient feed and the deaths of six cows. What the majority has failed to do is to examine all reasonable inferences from the evidence introduced and then to view the total proof in the light most favorable to the Askinses. That is the test. *John Cheeseman Trucking, Inc.* v. *Dougan*, 313 Ark. 229, 853 S.W.2d 278 (1993). In my judgment, if the feed caused aborted calves, listlessness, diarrhea, loss of appetite, and inability to lactate and these conditions continued and progressed over a period of time, death was the inevitable result. The vitamin deficiency need only be a proximate cause of death — not the sole reason for the cows' demise. *Missouri Pacific R.R.* v. *Mackey*, 297 Ark. 137, 760 S.W.2d 59 (1988); *see also Butler Mfg. Co.* v. *Hughes*, 292 Ark. 198, 729 S.W.2d 142 (1987).

One of the cows' owners, Jim Askins, described the progression of the disease and the demise of his cows with these words:

> I didn't have any health problems that I considered [on] a herd basis in 1989. In 1990, after feeding the Purina feeds I had a whole herd health problem. I had cows that got very sick, cows that pushed themselves to come in the barn, they didn't want to, but they knew that that was the routine. Those cows, some of those cows eventually just laid down and could not get up and come in the barn. They died. Other cows dropped dramatically in production and those cows that dropped so dramatic, based on that the breeding performance, cows that I could not get bred back, I had to cull some cows. They were not profitable to keep there.

The other owner, Robin Askins, described the cows' illnesses and deaths this way:

The milk production fell off. The longer into it that it went, the thinner they became. A number of them eventually were down and were not able to get up.

The correlation between illness and death in this combined testimony is clear.

The majority states that the Askins expert witness, Dr. Glen Krumme, a practicing veterinarian, could not testify that the Vitamin A deficiency caused the cows to die. Yet he did not dismiss this conclusion out of hand. What Dr. Krumme actually testified to was that it was "highly probable" that the bad feed caused the problems to the cows. He then answered on cross-examination that he did not do the autopsies on the cows, and because of that he did not know exactly what caused the deaths:

Q. Are you able to testify that these cows that died, died because of a Vitamin A deficiency?

A. I have — I can't testify to that one way or another.

A. Okay.

A. I wasn't present around the cows to see them autopsied or anything. There's lots of things that could have killed some of those cows. Some of them may have and some of them may not. I can't testify to that for certain.

That is a far cry from the majority's suggestion that Dr. Krumme dismissed the vitamin deficiency as a cause of death.

The same holds true of the animal nutritionist, Wayne Kellogg, who was called to testify for the Askinses and concluded after reviewing the records and reports on the Askins herd that there was an unusual loss of cows during the critical period of time. He was not called to testify about cause of death and did not do so. Yet, the majority extrapolates from Kellogg's absence of testimony on this point positive proof that the Vitamin A deficiency did not cause the cows to die. On cross-examination when Kellogg was asked about cause of death, he answered as follows:

DEFENSE COUNSEL: Do you find that the results of the laboratory test show that the cow died because of a Vitamin A deficiency?

KELLOGG: There's no evidence there that that was the case. The — in fact the Vitamin A was not even run.

Failure to run tests cannot translate into evidence that a Vitamin A deficiency was not linked to the death of the cows.

In 1990, this court reversed a summary judgment which had been entered in favor of the sellers of hog feed. *Baggett* v. *Bradley County Farmers Cooperative*, 302 Ark. 401, 789 S.W.2d 733 (1990). The buyers who operated a hog feeding business contended that the negligent mix of hog feed with cattle feed caused their hogs to become ill and die. Both sides moved for summary judgment. The sellers submitted the affidavit of a nutritionist stating that the feed did not cause the disease. The buyers attached part of the deposition of a veterinarian who testified that the mixed feed could change the hogs intestines and cause an eruption of illness but that he could not be certain of the precise cause of illness without knowing what else the hogs had eaten. We reversed the summary judgment in favor of the sellers and held that even though the veterinarian did not know what exactly caused the illness, this was a fact question for the jury to decide.

Similarly, in this case cause of death was for the jury to determine, and the jury did so based on substantial evidence. What the jury had before it was the testimony of the owners of the cows who presented their first-hand observations of the cows' illnesses and, in some instances, their deaths. These empirical observations on a day-to-day basis were coupled with the testimony of Dr. Krumme that it was "highly probable" that the bad feed caused the problems. Krumme did not examine the dead cows *post mortem* and could not state with medical certainty precisely what caused their death, which is reminiscent of the veterinarian in the *Baggett* case, but he could testify that the deficient feed made them very sick. And, again, the majority concludes that there was enough evidence to support the jury verdict that the Purina feed caused the serious illnesses. We should not require an expert witness to tell the jury that serious illness which goes untreated and unchecked may well lead to death.

I would view the proof favorably to the Askinses, as we are required to do, consider the inferences arising from that proof, and affirm the verdict.